**John D. UPHAM, and Estate of Marion B. Upham, Deceased, John D. Upham, Personal Representative, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 90–1172.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 10, 1990.

Decided Jan. 24, 1991.

---

Richard E. Timbie, Washington, D.C., for appellants.

Nancy Morgan, Washington, D.C. for appellee.

Before LAY, Chief Judge, and BRIGHT and TIMBERS,* Senior Circuit Judges.

BRIGHT, Senior Circuit Judge.

John D. Upham and the Estate of Marion B. Upham appeal the decision of the United States Tax Court[1] in favor of the Commissioner of the Internal Revenue Service (Commissioner). The appeal relates to certain disallowed deductions and an investment tax credit flowing from John D. Upham's share as a limited partner in an investment partnership which purchased rights in a motion picture. Taxpayer[2] primarily contends that the tax court erred in finding that the partnership had not acquired any substantial ownership of the film, but only a contract right to participate in the exploitation proceeds, with the resulting adverse tax consequences. For the reasons stated below, we affirm.

## I. BACKGROUND

### A. Facts

Taxpayer purchased a one-third interest in one unit of a limited partnership, Prince

---

* The HONORABLE WILLIAM H. TIMBERS, Senior Circuit Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

1. The Honorable Julian I. Jacobs, Judge for the United States Tax Court.

2. John D. and Marion B. Upham, husband and wife, timely filed a joint federal tax return for 1981, the year in question. Thereafter, Marion Upham died and John Upham was appointed personal representative of his wife's estate. References to "taxpayer," therefore, are to John Upham in both his individual capacity and in his capacity as the representative of the estate of Marion Upham.

Associates (partnership).[3] The partnership was organized and promoted by Daniel Glass, a New York attorney who promotes movie tax shelters,[4] to purchase and exploit the feature-length film, "Prince of the City." The tax deficiency assessed by the Commissioner and upheld by the tax court arose from the disallowance of deductions and an investment tax credit claimed by the taxpayer relating to the film.[5]

LAH Film Corporation produced the film for Orion Pictures Company (Orion) in 1980. Glass negotiated with Orion for the purchase of the film by the partnership. The package negotiated between Orion and Glass involved the simultaneous execution of two agreements, a purchase agreement and a distribution agreement.

Under the purchase agreement, the partnership paid Orion $11,875,000, the purported production cost of the film, to purchase the negative and copyright of the film, payable as follows: $100,000 cash at closing; $1,400,000 cash on February 1, 1982; delivery of a promissory note in the amount of $6,025,000, with interest at nine percent per annum, due January 10, 1990, purportedly recourse as to repayment of principal and non-recourse as to repayment of interest (recourse note); and delivery of a non-recourse promissory note in the amount of $4,350,000 with interest at nine percent per annum, due January 10, 1990 (non-recourse note). No payment of either principal or interest was due on either note until January 10, 1990. The agreement entitled the partnership to claim an investment tax credit with respect to $7,525,000 of the production costs of the movie. Orion retained the right to claim the investment credit with respect to the balance of the production costs.

Although Orion purported to transfer all its "right, title, interest, ownership and claims of any kind" in the movie and copyright to the partnership, the purchase agreement also included a rather extensive laundry list of rights retained by Orion.[6] Essentially, Orion reserved for itself all rights in the film and copyright except those needed to allow the partnership to distribute the film. Furthermore, Orion lacked the right, at the time of contracting, to sell the distribution rights because it had already committed them to Warner Bros. Inc. (Warner) under an earlier separate agreement between Orion and Warner. In

3. Taxpayer purchased this interest by paying $20,333 in cash and by executing two non-interest bearing promissory notes, secured by an irrevocable letter of credit. One note, payable on January 10, 1982, was in the amount of $20,000, and the second note, payable on January 10, 1983, was for $18,333. In addition to his capital contribution, taxpayer executed a Recourse Purchase Note Assumption Agreement (assumption agreement). Under the assumption agreement, taxpayer assumed the primary obligation to pay his pro rata share of the principal amount of the partnership's $6,025,000 recourse purchase note payable to Orion Pictures Company.

4. In the five years preceding the film transaction involved herein, Glass acted as a general partner or organizer of various partnerships which financed the production or purchase of at least 15 motion pictures.

5. This case represents a test case for the validity of the tax consequences of investing in the partnership, Prince Associates. The other limited partners have agreed to bind themselves to the outcome of this proceeding. As the validity of taxpayer's claimed losses turn on issues at the partnership level, many of our references will be to the partnership as a whole, rather than the particular taxpayer before us.

6. Specifically, the purchase agreement set forth the following reservation of rights:

(a) Any of the literary, dramatic and/or musical material contained in the Picture or upon which the Picture is based and the copyrights thereto and any renewals and extensions thereof (all said literary, dramatic and/or musical material being hereinafter collectively called the "Property"), except to the extent necessary to allow purchaser to distribute the Picture throughout the universe;

(b) Any television series rights, so-called television "special" rights, remake or sequel rights, or any other ancillary rights and/or allied rights (including, without limitation, theatrical stage rights) but specifically excluding the benefits of any merchandising and commercial tie-in rights, and music publishing and sound track album rights, which are included in the grant hereunder;

(c) The right to enter into agreements with respect to the Property.

(d) Any option rights with respect to the services of any person rendering services in or with respect to the production of the Picture.

the end, Warner handled the actual distribution of the film.

Additionally, the partnership agreed to provide Orion with $4 million for advertising expenses. In return, Orion agreed to spend an additional $7,875,000 to advertise the film, for a total advertising budget of $11,875,000. In the event Orion failed to spend that amount by December 31, 1982, Orion would become obligated to pay the partnership on January 10, 1990, as an additional license fee, a sum equal to the difference between $7,875,000 and the amount it actually expended on advertising above the partnership's $4 million contribution (additional license fee).

The partnership funded the advertising advance by giving Orion $1,650,000 in cash and borrowing $2,350,000 on a non-recourse note from Chemical Bank (marketing loan). Pursuant to an Assignment Agreement dated July 31, 1981, the partnership assigned its right to the first $2,350,000 of gross receipts as security for the marketing loan. Under that agreement, Orion agreed to pay the foregoing amount, to the extent then earned, directly to Chemical Bank on January 10, 1984. Orion further agreed to make the interest payments on the marketing loan. By letter dated July 31, 1981, Warner guaranteed the foregoing obligations of Orion.

Concurrently with the execution of the purchase agreement, Orion and the partnership entered into a distribution agreement pursuant to which Orion received back the exclusive and irrevocable right to distribute and exploit the film throughout the world in all media, "including, without limitation, all present and future theatrical, nontheatrical and television rights, merchandising, commercial tie-in, sound track album and music publishing rights." Orion acquired the distribution rights for an initial period of twelve years with renewal options for an additional twelve years and thereafter in perpetuity.

The agreement prohibited the partnership from making any changes to the film before delivering it back to Orion. On the other hand, the agreement granted Orion the right to edit the movie, change the movie titles, make foreign language versions of the movie, exhibit the movie at film festivals, and display its logo in the film credits and in connection with advertising the movie. Although the agreement required Orion to consult with the partnership with respect to advertising and promoting the movie and its release pattern, it expressly stated that Orion possessed final and binding decision-making authority.

The distribution agreement further provided for an allocation of gross receipts between Orion and the partnership based upon a series of complex computations. Cutting through the complexities, the agreement entitled the partnership to receive: (a) 3.5% of the first $15 million in gross receipts, plus (b) 7.5% of gross receipts in excess of $15 million until breakeven is reached,[7] plus (c) 8.2% of gross receipts in excess of breakeven. Orion received the remainder.

The distribution agreement further entitled the partnership to receive from Orion, by January 10, 1990, to the extent of and to be applied against the balances due on the recourse and non-recourse notes, an amount equal to 100% of the film's gross receipts derived prior to December 31, 1982, plus reduced multiples (ranging from 5.5 to .7) of gross receipts derived between 1982 and 1989 (multiplier clause). As a result of this provision, the gross receipts of the film would satisfy the partnership's obligation to Orion under the recourse note if the proceeds, generated over an eight-year period, totalled approximately $1,500,-000. Prior to making the investment, Glass's expert estimated that the film would gross $39.5 million.

In 1981, the taxpayer claimed his pro rata share of a depreciation deduction for the recovery of the purchase price of the film, a business expense deduction for the $4 million advertising expense, and a tenta-

---

**7.** A motion picture reaches "breakeven" when it has earned enough distributor's gross receipts to recover its production costs, after distribution fees, expenses and gross participations.

tive investment tax credit.[8] The IRS disallowed these items, asserting that the partnership did not acquire an ownership interest in the film and taxpayer sought review of the Commissioner's actions in the tax court.

### B. The Tax Court's Opinion

The tax court[9] made the following rulings in favor of the Commissioner which are challenged on appeal:

First, the tax court determined that the partnership purchased only a contractual right to share in the profits of the film, not the film itself. Accordingly, the tax court characterized the partnership's interest in the film as an intangible property right and therefore not subject to the accelerated cost recovery system. Recognizing that the partnership could depreciate the contract right under the straight-line method, the tax court assessed eight years as the useful life of the contract right for depreciation purposes.

Second, the tax court limited the partnership's depreciable basis in the contract right to the cash portion of the purchase price. It excluded both the non-recourse and recourse notes from the basis on the grounds that the notes did not represent bona fide debt.

Third, the tax court disallowed the claimed deduction for the advertising fund as an ordinary and necessary business expense because Orion controlled and directed the expenditure of those funds rather than the partnership. The court characterized the payment as an attempt to turn a capital contribution into a currently deductible expense. In light of this characterization, the tax court deemed the cash portion of the partnership's advertising fund to be part of the contract purchase price, and allowed the partnership to treat this cash amount as part of the basis for depreciation purposes. It excluded the marketing loan from basis on the ground that the partnership's liability was effectively guaranteed by Orion.

Fourth, the tax court denied the partnership's entitlement to claim an investment tax credit. The court characterized the partnership's relationship to the film as that of a lender or guarantor. Under applicable regulations, a lender who can look solely to the proceeds of the film for payment of the loan qualifies for an investment tax credit. Treas. Reg. § 1.48–8(a)(4)(iii). Here, the tax court concluded that the partnership could look to the additional license fee for repayment and thus did not qualify for an investment tax credit.

Finally, because the tax court determined that the taxpayer had substantially underpaid his taxes due to tax motivated transactions, it imposed additional interest.

On appeal, taxpayer contends that the tax court erred by: (1) concluding that the partnership purchased only an intangible contract right; (2) excluding the partnership's notes from basis; (3) failing to sustain the partnership's treatment of the film as five-year property for depreciation purposes; (4) concluding that the partnership was not entitled to deduct advertising expenses; (5) disallowing the investment tax credit; and (6) imposing additional interest charges.

## II. DISCUSSION

■ Initially, we note the basic principle that we engage in de novo review of the tax court's legal conclusions, but examine the underlying factual findings under the "clearly erroneous" standard. *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1191, 4 L.Ed.2d 1218 (1960); *Estate of Palmer v. C.I.R.*, 839 F.2d 420, 423 (8th Cir.1988).

### A. Characterization of Property Purchased

■ The crux of this appeal centers on the ownership of the film. Taxpayer

---

8. Taxpayer could not utilize his investment tax credit in 1981 because he reported a negative income, but sought to establish it for use in future tax years.

9. T.C. Memo. 1989–253, 57 T.C.M. (CCH) 508 (1989).

claimed an ownership interest in the film, via the partnership, and accordingly recognized a depreciation deduction for the exhaustion, wear and tear of the film pursuant to 26 U.S.C. § 167 (1976 & Supp. V 1981).[10] However, "[t]he determination of ownership of an asset for tax purposes is to be based on an analysis of many different factors indicative of ownership, not always on the bare legal title." *Bailey v. C.I.R.*, 912 F.2d 44, 47 (2d Cir.1990). Thus, where the transferor continues to retain significant control over the property transferred, the transfer of formal legal title will not operate to shift the incidence of taxation attributable to ownership of the property. *Bailey*, 912 F.2d at 47; *Durkin v. Commissioner*, 872 F.2d 1271, 1275 (7th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 84, 107 L.Ed.2d 50 (1989); *Tolwinsky v. Commissioner*, 86 T.C. 1009, 1041 (1986); *Law v. Commissioner*, 86 T.C. 1065, 1094 (1986); *see also Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); *Helvering v. F. & R. Lazarus Co.*, 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939).

Whether the partnership became the owner of the film for tax purposes as a result of the transactions with Orion is a question of fact to be determined by reference to the written agreements and the attendant facts and circumstances. *Durkin*, 872 F.2d at 1275. Factors pertinent to such a determination include:

> (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property.

*Houchins v. Commissioner*, 79 T.C. 570, 591 (1982) (citations omitted).

■ Furthermore, in the specific context of the sale of a movie, no sale occurs for federal tax purposes, unless the parties transfer both the negative and all substantial rights accompanying a movie copyright. *Durkin*, 872 F.2d at 1275. This is so because ownership of the negative without the copyright prerequisites lacks any value. *Id.*

■ Employing the above analysis, the tax court concluded that, upon a complete analysis of the purchase and distribution agreements, Orion retained ownership of the film, while the partnership merely purchased a contractual right to share in the proceeds of the film. We agree.

The tax court found that the integrated transfers between the partnership and Orion resulted in Orion retaining the rights to make copies of the film, to exhibit the film, and to otherwise exploit any dramatic material or literary material upon which the film was based. Furthermore, the tax court found that the film was promoted as an "Orion Pictures Release," and that Orion held the film rights to theatrical exploitation, pay television, video cassettes and commercial television throughout the world. The tax court concluded that "[s]uch enumerated rights combined with the sequel rights retained by Orion provided Orion with the entire bundle of rights that is a copyright." T.C. Memo. at 18. Additionally, the tax court found that through the complex terms of the distribution agreement, Orion, rather than the partnership, would receive the principal benefits from the film's financial success.

The record clearly supports these findings and the tax court's ultimate conclusion that, for the purpose of allocating deductions, Orion remained the owner of the film.

Taxpayer argues that we should engage in de novo review of the tax court's conclusions because it misapplied the law by failing to follow the caselaw in the sale-lease-back context. *See, e.g., Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). According to taxpayer, those cases required the tax court to give each agreement independent legal sig-

---

**10.** Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code of 1954 (I.R.C.), as amended and in effect during the year in issue.

nificance. However, even under the sale-leaseback caselaw, the analysis remains the same: "the court must determine, after the dust settles, in which party the benefits and risks of ownership rest." *Durkin*, 872 F.2d at 1276.

Ultimately, under any analysis, the "incidence of taxation depends upon the substance of a transaction.... To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). Thus, contrary to the taxpayer's assertions, the tax court neither misapplied the law nor made erroneous findings of fact.

### B. Depreciable Basis of Contract Right

The tax court properly recognized that although the partnership had not acquired the film, they nonetheless were entitled to a depreciation deduction on the asset they did acquire—the intangible contract right to a share of the film's proceeds. *See, e.g., Tolwinsky*, 86 T.C. at 1052 (right to share in proceeds of exploitation of motion picture was subject to exhaustion over time in the same way that an investment in the motion picture itself would have declined in value over time, so the interest is depreciable). This gave rise to the issue of whether the debt represented by the recourse and non-recourse notes used to finance the purchase may be included in the partnership's basis. The tax court determined that the notes did not represent bona fide debt and therefore excluded them from the partnership's basis. We agree.

Depreciation deductions are allowed to investors who have placed capital at risk through the purchase of an asset used in trade or business or held for the production of income. I.R.C. § 167. When, however, the debt used to purchase an asset is un-

likely to be paid by the taxpayer, that debt does not represent bona fide capital investment by the taxpayer and will be excluded from the depreciable basis of the asset. *Durkin*, 872 F.2d at 1276; *Estate of Baron v. Commissioner*, 83 T.C. 542, 550–53 (1984), *aff'd*, 798 F.2d 65 (2d Cir.1986).

Several factors serve to direct the inquiry of whether particular debt may be characterized as contingent: (1) whether the principal is to be paid solely out of exploitation proceeds; (2) whether the loan is non-recourse, shielding the taxpayer from personal liability; and (3) whether the purchase price of the asset unreasonably exceeds its fair market value. *Durkin*, 872 F.2d at 1276; *Bailey*, 912 F.2d at 48. Additionally, with regard to the non-recourse factor, any incentives, or lack thereof, to the debtor to pay the debt out of personal assets should be considered. *Bailey*, 912 F.2d at 48.

Applying these principles, the tax court concluded that neither of the notes represented genuine indebtedness and thus could not be included in the partnership's basis. The tax court determined that "the Nonrecourse Note and the provisions for retiring it were mere paper transactions lacking economic substance, and served no 'purpose, substance or utility apart from the anticipated tax consequences.'" T.C. Memo. at 20 (citations omitted).

With regard to the recourse note, the tax court determined that the assumption agreement lacked economic substance because none of the partners expected Orion to enforce it. Furthermore, as a result of the multiplier clause and the additional license fee, the film's proceeds would surely satisfy the recourse note. Finally, the tax court could find no plausible business reason for the multiplier clause except to exculpate the partners from any real monetary exposure under the recourse note.

The record amply supports these findings and we will not disturb them on appeal.[11]

11. Taxpayer places great emphasis on a recent decision of the Second Circuit in *Bailey v. Commissioner*, 912 F.2d 44 (2d Cir.1990). In that case, involving substantially similar facts, the

Second Circuit reversed and remanded the case to the tax court to redetermine whether the notes in question qualified as bona fide debt. *The Second Circuit ruled that the tax court*

## C. Useful Life of Property

 Initially, taxpayer objects to the tax court determining the useful life of the partnership's contractual right to share in the proceeds of the film for depreciation purposes. According to the taxpayer, the IRS did not dispute the taxpayer's characterization of the film as having a five-year useful life and therefore the tax court improperly reached this issue. After reviewing the record, we find no merit to taxpayer's contention.

Alternatively, taxpayer alleges that the tax court erred in assessing a useful life of eight years. Taxpayer argues that the tax court should have followed the general three to five year rule established in previous cases dealing with feature-length films. However, the determination of the useful life is a question of fact, dependent upon the facts adduced at trial.

We review the tax court's determination of an eight-year useful life under the clearly erroneous standard. *See Durkin*, 872 F.2d at 1278. Contrary to the taxpayer's contention, there exists substantial evidence in the record to support the tax court's conclusion. Expert testimony presented at trial indicated that in 1981, a movie could be expected to produce revenue for approximately twelve years. Based upon a timetable generally observed by the film industry in releasing a film, the evidence established that theatrical release of a movie generally lasts two years, followed by a release to cable television for the next two years. This is followed by three to fours years of network broadcasting, after which syndication broadcasts begin. Normally, syndication lasts five to seven years. Thus, the record clearly supports the tax court's assessment of a useful life longer than five years and we will not disturb that finding on appeal.

## D. Advertising Fund

 Section 162 of the Code allows a current deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business. Where the genuineness of those expenses is challenged, the taxpayer bears the burden of proving that the form of the transactions giving rise to those expenses accurately reflects their substance. *Welch v. Helvering*, 290 U.S. 111, 113–15, 54 S.Ct. 8, 8–10, 78 L.Ed. 212 (1933).

The distribution agreement required the partnership to advance Orion $4 million, purportedly for advertising expenses. The partnership satisfied the requirement at closing by paying $1.65 million in cash and by borrowing $2.35 million from Chemical Bank (marketing loan).

The tax court disallowed the advertising fund as a currently deductible business expense, concluding that Orion rather than the partnership incurred the advertising expenses. As found by the tax court, Orion had complete control over the funds once they had been provided by the partnership and that Orion independently made the decisions regarding the use of the funds for advertising.

Specifically, the evidence established that all invoices were submitted to either Orion or Warner, Orion and/or Warner made payment from a special checking account with Chemical Bank, and Warner's employees had authority to sign checks drawn from that account. Warner reimbursed itself for amounts it paid for advertising by writing checks on this special account.

should have made particular findings on whether there existed a reasonable relationship between the amount of debt and the value of the securing asset, and whether there existed any incentives to the debtor to pay the debt out of personal assets. *Id.* at 48.

Taxpayer argues that under *Bailey* the tax court's finding that the amount paid by the partnership approximated the film's value at the date of transfer precludes the tax court's subsequent determination that the notes do not qualify as bona fide indebtedness. However, taxpayer overlooks other findings made by the tax court. The tax court specifically noted that its earlier determination that the purchase price approximated the value of the film did not preclude a finding that the recourse note did not represent genuine debt because of its conclusion that the partnership had not purchased the film for federal tax purposes. Thus, unlike *Bailey,* the tax court has made the requisite findings to dispose of this issue.

The tax court characterized the advertising fund as an attempt "to transform a capital investment into a current deduction." T.C. Memo. at 26. As such, the tax court concluded that the cash portion of the payment represented a capital contribution and should be added to the partnership's depreciable basis.

Additionally, the tax court declined to include the marketing loan in the basis, finding that the loan did not represent bona fide debt. This conclusion was based on the tax court's finding that Orion and/or Warner Bros. had effectively guaranteed the partnership's purported debt obligation under the marketing loan to Chemical Bank.

Based upon the foregoing findings, which the record clearly supports, the tax court properly determined that the advertising advance did not constitute a currently deductible business expense but rather a capital contribution. We find no error.

### E. Investment Tax Credit

I.R.C. § 48(k) allows taxpayers an investment tax credit with respect to any new section 38 qualified picture film or video tape to the extent of the taxpayer's ownership interest in such film or tape. On appeal, the parties do not dispute that "Prince of the City" constitutes new section 38 property and is a qualified film. However, the parties do dispute whether the partnership has the requisite interest in the film to be entitled to an investment tax credit. Taxpayer asserts two theories in support of his entitlement to an investment tax credit: (1) that the partnership purchased an ownership interest in at least a part of the film sufficient to entitle it to an investment tax credit; and (2) that the partnership qualifies under the lender provisions for an investment tax credit.

■ The Code provides that "a person's 'ownership interest' in a qualified film shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of the film." I.R.C. § 48(k)(1)(C). Section 1.48–8(a)(4) of the Treasury Regulations defines the "ownership interest" re-

quired to claim a credit with respect to a qualified motion picture:

(4) **Ownership interest—(i) In general.** To obtain the investment credit with respect to a qualified film, a taxpayer must have an ownership interest in at least a part of the film. That is, the taxpayer must have a depreciable interest in at least a part of the film. However, the amount of credit allowable to a taxpayer with respect to a qualified film is determined only on the basis of that taxpayer's proportionate share of any loss which may be incurred with respect to the production costs of the qualified film. The proportionate share of any loss which may be incurred with respect to the production costs by a taxpayer is the amount that the taxpayer's capital is at risk.

For purposes of section 1.48–8, "a part" of a film "means the exclusive right to display a qualified film in one or more mediums of exhibition in one or more geographical areas over the entire period of substantial exploitation of the film in the medium(s) in the geographical area(s)." Treas.Reg. § 1.48–8(a)(2).

As found by the tax court, "the Partnership acquired a speculative and limited future profits interest in Orion's exploitation of the film, as opposed to an ownership interest in the film." T.C. Memo. at 17–18. The tax court determined that the partnership acquired no depreciable interest in the film because Orion had retained the exclusive and perpetual right to exploit the motion picture throughout the world. As we have previously determined that the record supports these findings, we must conclude that the partnership did not own a part of the film and therefore does not qualify for an investment tax credit under the above regulations.

■ Alternatively, taxpayer alleges that the tax court erred in applying the Treasury Regulation which allows certain "lenders or guarantors" to qualify for an investment tax credit. Under that regulation,

**1338**

[t]o qualify for the investment credit with respect to a qualified film, the taxpayer must have a depreciable interest in at least a part of the film. Solely for purposes of this paragraph, a taxpayer who, at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof, will be regarded as having a depreciable interest in at least a part of the film if he can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film.

Treas.Reg. § 1.48–8(a)(4)(iii).

The tax court determined that the partnership failed to qualify for an investment tax credit because, under the purchase and distribution agreements, the partnership could look to sources other than the proceeds generated by the film for repayment. Specifically, the tax court found that the partnership could look to the additional license fee to recoup its investment. We agree.

The plain language of the distribution agreement entitled the partnership to receive back from Orion an amount equal to the difference between the advertising budget of $11,875,000 and the amount actually expended on advertising in excess of the partnership's $4 million advance. This provision operated automatically, irrespective of the film's success, and thus constituted a source other than the proceeds of the film to which the partnership could look for repayment. As such, the partnership did not fall within the class of "lenders or guarantors" who qualify for an investment tax credit.

F. Additional Interest

 Finally, taxpayer asserts that the tax court erred by imposing additional interest charges pursuant to I.R.C. § 6621(c). The tax court held taxpayer liable for increased interest with respect to the partnership's overstatement of its depreciable basis in the film by more than 150% and with respect to deficiencies arising from claiming the advertising expense deduction through an accounting method that resulted in substantial distortion of income.

Taxpayer relies only upon his prior arguments that the notes were properly includible in basis and that the advertising fund constituted an ordinary business expense attributable to the partnership to establish that the tax court erred. However, we have previously determined that the tax court correctly resolved these issues. Thus, as taxpayer alleges no further grounds for relief, we must uphold the tax court's imposition of additional interest charges.

III. CONCLUSION

Accordingly, we affirm the judgment of the tax court.