Thomas J. DURKIN, Colette A. Durkin, Jerome A. Grossman and Sybil G. Grossman, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 88–1290.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1988.

Decided April 5, 1989.

Sheldon I. Fink, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for petitioners-appellants.

Nancy G. Morgan, Atty. Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before BAUER, Chief Judge, CUMMINGS and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

Thomas J. Durkin and Jerome A. Grossman and their spouses have appealed from decisions of the Tax Court favorable to the Commissioner of Internal Revenue. The facts of the case are complex and are covered in 35 pages of the Tax Court's findings of fact. 87 T.C. 1329, 1332–1366. Since those findings are so lengthy and have not been contested on appeal, only the "bare bones" facts will be discussed under each of the four issues appealed.[1]

## I. Jurisdictional Issue As to Durkin Appeal

█ In its opinion, the Tax Court mentioned that "at least 500 petitioners have cases related to the case at hand, which concern millions of dollars * * *." 87 T.C. at 1402. The Durkin and Grossman test cases were heard in consolidation in a one-week trial running from September 17 to 26, 1986 (Petitioners' Br. 1). The Tax Court's opinion disposed of all issues pending in the Durkin case on December 22, 1986, enabling Rule 155[2] calculations to be made with respect to the various taxable years in question. Since the Tax Court had completed the factual findings necessary in the Durkin case while certain issues remained unresolved in the Grossman case, the Tax Court severed the Durkin case on May 29, 1987. Decisions in the Durkin case were entered on August 10, 1987.

Because the issues in both the Durkin and Grossman cases were ultimately to be appealed to this Court, in accordance with an agreement with the Commissioner of Internal Revenue the Durkins moved on September 9, 1987, to vacate the August 10, 1987, decisions involving them so that they could be reentered and appealed concurrently with the Grossman decisions. On November 4, 1987, the Durkin and Grossman cases were consolidated, and on the following day the Tax Court vacated the Durkin decisions and reentered them while simultaneously entering decisions in the Grossman case. A joint notice of appeal was filed by the four taxpayers on February 1, 1988.

During oral argument we noted the possibility that this Court might not have jurisdiction of the Durkin appeal since the joint notice of appeal covering both cases was filed more than 90 days following the Tax Court's original Durkin decisions, apparently in contravention of Rule 13(a) of the Federal Rules of Appellate Procedure ("FRAP").[3] However, the joint notice of appeal was timely filed within 90 days of the reentered Durkin decisions. FRAP Rule 13(a) provides in part:

> The running of the time for appeal is terminated as to all parties by a timely motion to vacate or revise a decision made pursuant to the Rules of Practice

---

1. The Tax Court decided fourteen issues, but these appeals involve only four of them.

2. Tax Court Rule 155 provides for the computation of the tax deficiency based on the Tax Court's findings of fact.

3. Supplemental briefs on the jurisdictional question were filed by Durkins and the Commissioner within a month after the oral argument. Both parties submitted that this Court has jurisdiction over the Durkin appeal.

of the Tax Court. The full time for appeal commences to run and is to be computed from the entry of the order disposing of such motion, or from the entry of decision, whichever is later.

A motion to vacate or revise a decision of the Tax Court must be filed within 30 days after the decision has been entered, "unless the Court shall otherwise permit." Tax Court Rule 162. The Durkins' motion to vacate was timely filed on September 9, 1987, within 30 days of the Tax Court's August 10, 1987, decision.

Under the plain language of Rule 162 and the practice of the Tax Court, the running of the Durkins' period for appeal was terminated upon filing a motion to vacate and restarted by the Tax Court's "entry of the order disposing of such motion." Although this Court has held that a motion under Rule 59(e) of the Federal Rules of Civil Procedure to "alter or amend" a judgment which, as here, does not seek any substantive change in the judgment will not toll the period for appeal, *Martinez v. Trainor*, 556 F.2d 818 (7th Cir.1977), the difference in language and practice of Rule 162 justifies a different conclusion. Rule 162 addresses motions to "vacate or revise," in contrast to "alter or amend" in Rule 59(e), suggesting that such a post-trial motion need not seek to modify the substance of the judgment but may simply seek to vacate the judgment in its entirety. Policy considerations that jurisdictional rules be clear and simple, *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988), militate in favor of allowing any motion to vacate or revise a Tax Court judgment to terminate and restart the appeals period independent of the motivation behind the motion. This interpretation of Rule 162 would seem to be consistent with the practice of the Tax Court which has not indicated in its treatment of such motions that an examination of the grounds for vacatur or revision of the judgment is necessary to restart the appeals period. *E.g., Trohimovich v. Commissioner*, 776 F.2d 873, 875 (9th Cir.1985) (Tax Court heard and denied two successive motions for post-trial relief); see also *Page v. Commissioner*, 823 F.2d 1263, 1269 (8th Cir.1987); *Wilson v. Commissioner*, 474 F.2d 600 (5th Cir.1973), certiorari denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003. Since the Durkins' motion to vacate was disposed of by the Tax Court on November 5, 1987, the Durkins' notice of appeal was timely filed on February 1, 1988, within 90 days of the disposition of the motion.

## II.

### A. Ownership of the Movies for Purpose of Depreciation Deductions

The crux of this appeal centers on the ownership of motion pictures. Durkin and Grossman had claimed ownership of several films and accordingly recognized depreciation deductions on their tax returns. Taxpayers purport to have acquired ownership of the subject films as a result of a circular series of transactions between Paramount Pictures Corp. ("Paramount"), Film Writers Co. ("FWC") and the two partnerships in which taxpayers have an ownership interest. FWC, a California corporation, purchased the six films at issue from Paramount between November 2, 1977, and May 25, 1978. Balmoral Associates, Ltd. ("Balmoral"), formed on October 24, 1977, purchased "First Love" and "The One and Only" from FWC on November 2, 1977, and December 2, 1977, respectively. Shelburne Associates, Ltd. ("Shelburne") was organized on December 1, 1977, and purchased from FWC "Heaven Can Wait" on December 2, 1977, and "Grease," "Foul Play" and "The Bad News Bears Go To Japan" ("Bears 3") on May 25, 1978. The Shelburne and Balmoral partnerships immediately entered into distribution agreements of 28–year durations with Paramount under which Paramount acquired the exclusive right and privilege to distribute, exhibit, market, reissue and otherwise exploit the six films in return for a share in the gross receipts from exploitation of the films. Durkin became a limited partner in Balmoral Associates by paying $35,000 for one-half unit. Similarly, Grossman became an indirect limited partner in Shelburne

Associates by purchasing one unit for $316,000.[4]

■ Whether Balmoral and Shelburne became the owners of the films for tax purposes is a question of fact to be determined by the written agreements, attendant facts and circumstances. *United States v. Wernentin*, 354 F.2d 757, 762–763 (8th Cir.1965); *Tolwinsky v. Commissioner*, 86 T.C. 1009, 1041 (1986). The Tax Court's findings of fact may not be disturbed on appeal unless clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575–576, 105 S.Ct. 1504, 1512–1513, 84 L.Ed.2d 518 (1985). It is axiomatic that the substance of a transaction rather than its form controls for federal tax purposes. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945); *Saviano v. Commissioner*, 765 F.2d 643 (7th Cir.1985). To qualify under Section 167(a) of the Internal Revenue Code of 1954, taxpayers must retain the interests in the property. *Frank Lyon Co. v. United States*, 435 U.S. 561, 581–584, 98 S.Ct. 1291, 1302–1304, 55 L.Ed.2d 550 (1978); 1 B. Bittker, Federal Taxation of Income, Estates and Gifts, ¶¶ 4.4.2 and 4.4.3. The transfer of formal legal title is disregarded for tax purposes where the transferor, here Paramount, retains the principal control over the property transferred. *Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940); *Helvering v. F. & R. Lazarus Co.*, 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939); *Corliss v. Bowers*, 281 U.S. 376, 378, 50 S.Ct. 336, 336, 74 L.Ed. 916 (1930). In this case Paramount held such interests.

■ Ownership of a movie includes both the negative and the copyright. 17 U.S.C. §§ 27 and 202. The partnerships' ownership of the negative without the copyright prerequisites is without value. *Goldsmith v. Commissioner*, 143 F.2d 466, 467 (2d Cir.1944) (L. Hand, J., concurring). For federal tax purposes, there is no sale of a movie unless there is a transfer of both the negative and all substantial rights accompanying a movie copyright. *Conde Nast Publications, Inc. v. United States*, 575 F.2d 400, 405 (2d Cir.1978); *Cory v. Commissioner*, 23 T.C. 775 (1955), affirmed, 230 F.2d 941 (2d Cir.1956), certiorari denied, 352 U.S. 828, 77 S.Ct. 43, 1 L.Ed. 2d 50 (1956); *Tolwinsky*, 86 T.C. at 1042–1043.

The Tax Court concluded that the rights in the six movies acquired by Balmoral and Shelburne were too insubstantial to qualify as ownership interests for purposes of depreciation deductions. This conclusion was amply supported by the record. Except for the partnerships' bare title to the copyrights, Paramount retained the rights to produce copies, prepare derivative works, distribute copies to the public, exhibit the movies to the public, and display still photographs taken therefrom. Paramount even retained the remake sequel rights and vital financial interests in the motion pictures and their proceeds. A Paramount official testified that it would not have sold the films without receiving back the rights to exploit them. Under the agreements in question, as accurately described by the Tax Court, Balmoral and Shelburne retained only the right to inspect the negatives, and that right was never exercised. At the time of the "sale," whatever rights the partnerships acquired were immediately transferred back to Paramount except for bare title. Paramount rather than the partnerships was the true owner of the films because of its financial interest and control over their commercial exploitation.

In an attempt to show proprietary interests, the partnerships rely on the terms for renewing the distribution agreements. Under the renewal terms, Paramount was required to pay $25,000 per film 28 years later, or a present value of $3,600. The partnerships' interest in the renewal provision was certainly an insubstantial right since the evidence showed that each film

---

4. Grossman was indirectly a limited partner in Shelburne Associates because he was a limited partner in Good News Boys (which he founded) and it became a limited partner in Shelburne Associates by purchasing one share for $316,-000. That is why Grossman's interest in Shelburne Associates is an indirect limited partnership interest. It makes no difference in the outcome of the Grossman case.

would be fully depreciated by 1986, and one of the partnerships, Shelburne, even reported depreciation on its returns for a three-year life for films for 1978 and a four-year life for the following years. Taxpayers also argue they were owners because Paramount was supposedly precluded from selling its distribution rights in the United States and Canada without the partnerships' permission. However, the distribution agreements themselves allowed Paramount to make worldwide territorial grants.

Taxpayers also claim that they possessed ownership interests in the films because the Tax Court allowed them to take investment tax credits with respect to the films. Taxpayers, however, fail to recognize that ownership for purposes of claiming an investment tax credit is a distinct inquiry from the test of ownership for claiming depreciation deductions. While ownership for the purpose of depreciation is predicated on a capital investment in the property, *Gladding Dry Goods Co. v. Commissioner*, 2 B.T.A. 336 (1925), an ownership interest in a film for investment credit purposes exists when the taxpayer is a lender or guarantor at the time the film is placed into service and can look for repayment "solely to the proceeds generated from the exhibition or disposition of at least a part of the film." Treas.Regs., § 1.48–8(a)(4)(iii) (1954 Code) (26 C.F.R.). *Law v. Commissioner*, 86 T.C. 1065, 1108 (1986); *Vandenhoff v. Commissioner*, 53 T.C.M. (CCH) 271, 285, 1987 WL 40183 (1987). Allowing the taxpayers to claim investment tax credits for their ownership interests is therefore not inconsistent with disallowing depreciation deductions.

Finally, taxpayers liken these transactions to a sale-leaseback where the purchaser-lessor retains a depreciable interest in the asset. The analysis is unchanged. In either sale-leasebacks or the transactions at issue here, the court must determine, after the dust settles, in which party the benefits and risks of ownership rest. In sum, the findings of the Tax Court that the partnerships did not retain any substantial attributes of ownership in the films in any sense justifying depreciation deduc-

tions under Section 167(a) of the Internal Revenue Code are not clearly erroneous.

**B. Depreciation of Partnerships' Contractual Rights in Movies**

Although the Tax Court determined that the partnerships retained no substantial ownership rights in the film negatives, it concluded that the taxpayers did retain a gross receipts participation and a net profits interest in the proceeds of Paramount's distribution efforts. The partnerships' residual interest represents an intangible asset subject to amortization. Ordinarily the cost of the acquisition of the property subject to amortization or depreciation constitutes the taxpayer's basis therein (Section 1012 of the Internal Revenue Code). The partnerships financed the acquisition of their interests in the movies with cash and short- and long-term notes. The long-term notes were due in 1986. However, the Tax Court determined that Balmoral's and Shelburne's bases in those rights excluded the long-term, essentially nonrecourse notes on the ground that the notes did not represent bona fide indebtedness.

Depreciation deductions are allowed to investors who have placed capital at risk through the purchase of an asset used in trade or business or held for production of income (Section 167 of the Internal Revenue Code). When, however, the debt used to purchase an asset is unlikely to be paid by the taxpayer, that debt does not represent a bona fide capital investment by the taxpayer and will be excluded from the depreciable basis of the asset. *Estate of Baron v. Commissioner*, 83 T.C. 542, 550–553 (1984), affirmed, 798 F.2d 65 (2d Cir. 1986). Debt may be characterized as contingent in this manner when, as in this case, the principal is to be paid solely out of exploitation proceeds, the loan is nonrecourse, shielding the taxpayer from personal liability, and the purchase price of the asset unreasonably exceeds its fair market value. *Tolwinsky*, 86 T.C. at 1053–1059. Such financing is characteristic of tax shelters. Nonetheless, as the taxpayers properly assert, nonrecourse debt is commonly

used in bona fide commercial transactions with genuine business purposes and does not warrant reflexive exclusion from the basis of the asset purchased but necessitates examination of the expectations of the parties and the structure of the transactions. See, *e.g., Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947).

To secure reversal, Balmoral and Shelburne submit that the long-term notes were initially with recourse and therefore properly includible in the partnerships' bases, or if they were mostly nonrecourse, the notes were still includible in the partnerships' bases because the purchase price paid for the films represented their fair market value. We cannot agree. The Tax Court found that the long-term notes did not qualify as bona fide indebtedness because the notes were nearly certain to be converted to nonrecourse notes, the expectations between the parties reflected that the recourse notes would not be enforced if the movies were unsuccessful, and the amount of the notes clearly exceeded the fair market value of the partnerships' interests in the films. The record demonstrates that the partnerships' long-term notes were essentially nonrecourse from the beginning of the transaction. Each note was made convertible to nonrecourse upon gross receipts events or non-theatrical events that did not depend upon the success of the films. Even one of the participants testified that their non-conversion to nonrecourse notes was a "long shot."

Each of Balmoral's long-term notes with respect to its two movies was to convert to nonrecourse notes if Paramount received any amount from a syndicated television broadcaster. Testimony indicated that syndication routinely occurred five and a half years following theatrical release, rendering the conversion event a certainty. Likewise, with respect to Shelburne's four movies, it was obvious that their long-term notes would become nonrecourse before they were due. With respect to "Heaven Can Wait," the conversion depended upon Paramount's receipt of $1.5 million from cable and free home television. Two witnesses testified that the film would earn at least $1.5 million from television exhibition and another witness testified that he thought it would be sold to home television. There was also testimony that even a mediocre movie would generate $1.5 million in revenue from syndicated television, which does not take into account the other forms of television sales.

As to Shelburne's remaining three movies, long-term notes could convert to nonrecourse when Paramount received revenue from non-theatrical sources of $6.5 million for "Grease," $4 million for "Foul Play," and $6 million for "Bears 3," respectively. The movies would normally show for 18 to 24 months in theaters, and cable television broadcast would follow for the next year. Then network broadcasting would continue for another three years before syndication broadcasts would begin five to seven years after theatrical release. Even before the execution of the purchase agreements for these films in 1977 and 1978, agreements had been reached and were subsequently executed to license "Grease" for network broadcast for $6,190,000, "Foul Play" for $3.5 million, and "Bears 3" for $5.5 million. Thus it is obvious that the long-term notes would convert to nonrecourse before they came due in 1986.

As the Tax Court found, the principal difference between the purchase and sale of the movies by FWC and the partnerships is that the partnerships financed the purchase with recourse debt subject to conversion while FWC used mostly nonrecourse debt. The transaction was structured in this manner to lend the debt the appearance of being at risk within the meaning of Section 465 of the Internal Revenue Code. The Tax Court found that this increase in purportedly recourse debt exceeded the fair market value of the insignificant ownership rights in the films retained by the partnerships, thus indicative of the parties' expectations that the recourse debt would not be collected from the individual partners if the partnerships failed to make payment. To this extent, these partnerships were classic tax shelters, for the aggregate purchase price unreasonably exceeded the value of the property. Therefore the notes did not constitute genuine indebtedness

and could not be included in the purchasers' bases in the property. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir.1976).[5] The Tax Court was correct in excluding the long-term notes from the partnerships' bases, leaving the sum of the cash and short-term notes as the depreciable basis.[6]

### C. Useful Life for Depreciating Shelburne's Contract Rights

■ In 1979 and 1980, Shelburne used the straight-line method of depreciation with four-year useful lives for each of the movies. The Commissioner argued for an eight-year useful life based upon the maturity of the long-term notes in 1986. The Commissioner's contention was rejected because it bore "no relevance to the useful life of Shelburne's contract rights." 87 T.C. at 1376. Judge Simpson then concluded that six years was a reasonable life for Shelburne's contract rights.

The evidence showed that the useful life of the participation rights in each of the four films was at least six years. Even an ordinary film would generate $1.5 million in syndicated television fees which resulted five and a half years after theatrical release, and taxpayers testified that the films would produce revenues for the two partnerships until June 30, 1986. It was shown that the four Shelburne films could continue to generate revenues beyond six years and might not be written off until 1986, and in one instance for twelve years. The record does not reveal and the taxpayers have failed to provide this Court with any alternative evidence of the useful lives of the films to demonstrate that the Tax Court's finding as to the useful lives is clearly erroneous.

### D. Deductibility of Shelburne's Bonus Payments in 1979 and 1980

■ In order to meet the significant cash outlays required by the transactions at issue, Shelburne received loans from the Delta Partnership for $2,089,000 in 1978 and $54,500 in 1979. Pursuant to the loan agreement, Shelburne was required to pay 9½% interest per year plus bonus payments of 10% of all worldwide non-theatrical gross receipts, provided Shelburne received distribution proceeds of 50% or more of Shelburne's cash expenditures for each film. The source of the funds loaned by Delta was four Netherland Antilles corporations which loaned the funds to CMS, a partner of Delta. Shelburne deducted as interest expense the bonus payments of $143,804 and $192,637 which it made to Delta in 1979 and 1980. The Tax Court disallowed these bonus payments on the ground that there was no bona fide business purpose for them and that they were in truth priority distributions of profits.

Under Section 163(a) of the Internal Revenue Code, income tax deductions are permitted for "interest paid or accrued within the taxable year on indebtedness." Such payments are deductible only if the underlying obligation is a bona fide debt and the payments made are ordinary and necessary business expenses. *Knetsch v. United States*, 364 U.S. 361, 364–366, 81 S.Ct. 132, 134–135, 5 L.Ed.2d 128 (1960); *Levin v. Commissioner*, 832 F.2d 403, 407–408 (7th Cir.1987); *Beck v. Commissioner*, 678 F.2d 818, 821 (9th Cir.1982); *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir.1966), certiorari denied, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967). Delta had lent the funds in question to Shelburne at 9½% annual interest plus bonus payments equaling 10% of all Shelburne's worldwide non-theatrical gross receipts. Delta had obtained the funds at 9% per annum but charged Shelburne 9½% plus the bonus payments. The Commissioner conceded in the Tax Court the legitimacy of the underlying debt between Delta and Shelburne.

---

**5.** *Brannen v. Commissioner*, 722 F.2d 695 (11th Cir.1984); *Brountas v. Commissioner*, 692 F.2d 152 (1st Cir.1982); *Hilton v. Commissioner*, 671 F.2d 316 (9th Cir.1982); *Gibson Products Co. v. United States*, 637 F.2d 1041, 1045 and n. 8 (5th Cir.1981); *CRC Corporation v. Commissioner*, 693 F.2d 281 (3d Cir.1982).

**6.** The Tax Court noted that Mr. John Heyman's fee for arranging the transactions between FWC and the partnerships should be deducted from the sum of the cash and short-term notes. This is not an issue.

On the remaining issue, the burden of proof was on the taxpayers in the Tax Court to demonstrate that the bonus payments were ordinary and necessary business expenses. Our conclusion is that Shelburne has not proved that the bonus payments were compensation associated with the debt. Instead, as the Tax Court found, the bonus payments were for the purpose of diverting funds from Shelburne to the CMS partnership which controlled Delta. Since the loan to Shelburne was certain to be repaid, and actually was repaid in 1979 even though not due until mid–1980, it cannot be rightly contended that the bonus payments were compensation for the use of the funds. The Tax Court's finding that the bonus payments were distributions of Shelburne's profits rather than deductible interest payments is not clearly erroneous.

The decisions of the Tax Court are affirmed.