**DRL ENTERPRISES, INCORPORATED,**
Plaintiff–Appellant,

v.

**UNITED STATES of America,**
Defendant–Appellee.

No. 93–2631.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 14, 1994.

Decided May 24, 1994.

Francis X. Grossi, Jr., Amy A. Hijjawi (argued), Rex A. Guest, Katten, Muchin & Zavis, Chicago, IL, for plaintiff-appellant.

Michael J. Shepard, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Div., Chicago, IL, Gary R. Allen, Ann Belanger Durney, Regina S. Moriarty (argued), Nancy G. Morgan, Dept. of Justice, Tax Div., Appellate Section, Washington, DC, David S. Newman, Department of Justice, Tax Div., Washington, DC, for defendant-appellee.

Before CUMMINGS, BAUER, and COFFEY, Circuit Judges.

BAUER, Circuit Judge.

This appeal requires us to decide whether a lender who advances money for the production costs of a film, the repayment of which is calculated as a percentage of the film's gross proceeds, is entitled to an investment tax credit ("ITC") under the federal tax code. The district court held that the government was entitled to summary judgment because the lender's repayment was not "solely" from the proceeds of the film. We reverse and remand for further proceedings.

## I.

In October of 1982, Adams Apple Production Company, a subsidiary of DRL Enterprises, reached an agreement with Paper Clip Productions to produce a motion picture owned by Paper Clip entitled "Easy Money," and starring Rodney Dangerfield. The agreement obligated Adams Apple to provide capital and services in the production of the film. Adams Apple arranged for most of the financing to come from a commercial lender. Additionally, however, Adams Apple agreed to advance $1.3 million of its own funds to Paper Clip. Rather than entering a standard loan arrangement for this advance, Adams Apple agreed to receive in return, periodic payments at a rate of 7.674% of the film's gross receipts. If Adams Apple's share of receipts ever exceeded $1.45 million, it would then begin to receive five percent of the film's net profits. On the other hand, if thirty-six months after the film's release, Adams Apple's share failed to reach $650,000, Adams Apple would be entitled to receive, in addition to its original share, fifty percent of all revenues generated by the film's eventual television release.

Prior to execution of the agreement, Paper Clip assigned its rights and obligations to the Orion Pictures Corporation. The assignment made Orion responsible for collecting the film's proceeds and for ensuring that Adams Apple received its share of the revenues. The agreement did not grant Adams Apple a lien or any other security interest in the film's revenues or profits and it specifically provided that these funds were "Orion's sole and exclusive property."

Despite the prodigious comedic talents of its lead actor, "Easy Money" was not easy money for the film's investors. Nonetheless, the film generated revenues sufficient for Adams Apple to recoup its $1.3 million advance as well as an additional $150,000. In November of 1983, on Adams Apple's behalf, DRL sought to obtain an ITC for the advance. The Internal Revenue Service denied the ITC. On May 15, 1991, DRL brought suit against the United States seeking a re-

fund based on the ITC. The district court granted summary judgment in favor of the government. DRL appeals.

## II.

We review a decision granting summary judgment *de novo. Doe v. Allied Signal Inc.,* 925 F.2d 1007, 1008 (7th Cir.1991). Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

During the time of the relevant transactions, the federal tax code offered ITCs to taxpayers with an "ownership interest" in films "created primarily for use as public entertainment or for educational purposes." 26 U.S.C. § 48(k)(1) (1986). The statute calculates one's "ownership interest" on the basis of the "proportionate share of loss which may be incurred with respect to the production costs of such film." 26 U.S.C. § 48(k)(1)(C) (1986). Recognizing that the line between lenders who are simply creditors and lenders who in fact have an "ownership interest" may be unclear, the Treasury Department drafted a regulation designed to clarify the distinction. Treas.Reg. § 1.48(8)(a)(4)(iii) (1993).[1] Essential in determining the ITC eligibility of an entity which advances funds for the production of a film is whether the entity can "look for repayment or relief from liability solely to the proceeds generated from exhibition or disposition of at least a part of the film." *Id.* In devising this scheme, it was the legislature's intention to provide ITCs to taxpayers who put their capital at risk. *Law v. Commis-*

*sioner,* 86 T.C. 1065, 1109 (1986). "The thrust of section 1.48(8)(a)(4)(iii) of the regulations is to allow an investment credit to persons with an equity-like interest in the film, even if the interest does not amount to ownership or a depreciable interest, but to disallow it to pure creditors, such as commercial lenders." *Id.*

■ The government argues first that Adams Apple did not bear a proportionate share of loss because its repayment was calculated out of gross receipts rather than net profits. In the government's view, this arrangement lessened the risk of Adams Apple relative to the film's legal owners, thereby disqualifying Adams Apple from receiving the ITC. This position is untenable. The regulation was designed to stimulate investment in the motion picture industry by providing benefits to taxpayers who do not have legal title to the film but who nonetheless have a financial stake in the film's success. Treas.Reg. § 1.48(8)(a)(4)(iii) (1993). As a result, in both *Law* and *Vandenhoff v. Commissioner,* 53 T.C.M. (CCH) 271, 1987 WL 40183 (1987), partnerships which had loaned money for film production in return for a share of the film's gross receipts were entitled to ITCs because they had taken a risk position. We find this case to be indistinguishable. In advancing $1.3 million of its own money to Paper Clip, Adams Apple clearly put its money at risk. The agreement, which specifically addresses what is to occur if Adams Apple's share failed to exceed half of its advance, is proof that Adams Apple intended to take this risk. Repayment of the loan depended solely on the success of the movie. Neither the government nor the district court in its opinion disputes this cru-

1. The regulation reads in relevant part:

    **(iii) Certain lenders and guarantors considered to have an ownership interest.** To qualify for the investment credit with respect to a qualified film, the taxpayer must have a depreciable interest in at least a part of the film. Solely for purposes of this paragraph, a taxpayer who, at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof, will be regarded as having a depreciable interest in at least part of the film if he can look for repayment or relief from liability solely to the proceeds gen-

erated from exhibition or disposition of at least a part of the film.... A commercial lender will not be considered to have an ownership interest in any film simply by reason of a commercial loan. If a lender or guarantor (other than a producer who owned the film and made or guaranteed a loan to a purchaser) is regarded as having an ownership interest in the film, the lender or guarantor shall be treated as having purchased the interest under paragraph (g)(1) of this section for an amount equal to the principal amount of the loan which it made or guaranteed.

Treas.Reg. § 1.48(8)(a)(4)(iii) (1993).

cial fact. That Adams Apple eventually realized a gain on its investment is immaterial since the determination as to whose and how much capital is at risk is to be made as of the time the film is first placed in service. *Durkin v. Commissioner*, 872 F.2d 1271, 1276 (7th Cir.), *cert. denied*, 493 U.S. 824, 110 S.Ct. 84, 107 L.Ed.2d 50 (1989).

■ On appeal, the government defends the reasoning of the district court. It contends that because the agreement failed to provide Adams Apple with a security interest in the film's proceeds and failed to require Orion to segregate the proceeds owed to Adams Apple, Adams Apple's right to repayment did not come "solely" from the film's proceeds. According to the government, the reference to the film's proceeds was intended merely to specify a schedule for repayment, not a source. The government's strained reading of the regulation simply does not follow logically from the statute. By limiting the ITC to lenders whose repayment depended solely on the film's proceeds, legislators were ensuring that only lenders with a legitimate stake in the film could take advantage of the ITC. The word "solely" does not inject into the statutory scheme a physical requirement that the film distributor earmark and segregate the lender's funds.

■ The government also argues that since Paper Clip remained accountable to Adams Apple in the event that Orion did not meet its repayment obligations, Adams Apple's right of repayment did not come "solely" from the film proceeds. This argument misses the fundamental point. Even if Orion reneged on its repayment obligations, Adams Apple would not be entitled to recover from Paper Clip any more than its contracted-for share of the film's proceeds. Hence, the fact that Adams Apple could look to either Orion or Paper Clip for repayment did not eliminate the risk involved since repayment remained tied directly to the film's success.

### III.

By purchasing a gross receipts participation in "Easy Money," Adams Apple agreed to incur a portion of the risk involved with the success of the film. Consequently, as a matter of law, Adams Apple was entitled to claim an investment tax credit. The district court's decision granting summary judgment in favor of the government is reversed and the case is remanded with instructions to grant summary judgment to DRL.