**Alan F. SEGAL and Kathleen W. Segal, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

Nos. 94–1214, 94–1215, 94–1216 and 94–1217.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1994.

Decided Dec. 2, 1994.

Rehearing Denied Dec. 27, 1994.

---

Theodore A. Sinars (argued), Madden, Jiganti, Moore & Sinars, Chicago, IL, for petitioners-appellants.

Richard Farber, Gary R. Allen, Thomas J. Clark (argued), Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for respondent-appellee.

Before ESCHBACH, RIPPLE and ROVNER, Circuit Judges.

ESCHBACH, Circuit Judge.

Alan F. Segal and his wife ("Segal") claimed deductions on their joint income tax returns during the years 1979 through 1982 flowing from Alan Segal's share in a general partnership which purchased rights in a motion picture. The Commissioner of Internal Revenue ("Commissioner") disallowed these deductions and issued a notice of deficiency. Segal petitioned the United States Tax Court for relief pursuant to 26 U.S.C. §§ 6213 and 7442 and the Tax Court issued decisions favorable to the Commissioner. For the reasons below, we affirm.

## I.

In 1977 and 1978, Calvin Eisenberg ("Eisenberg"), a tax attorney, organized a number of partnerships for the purpose of investing in one or more movies produced by Paramount Corporation ("Paramount"). Some of these transactions were the subject of this court's opinion in *Durkin v. Commissioner*, 872 F.2d 1271 (7th Cir.), *cert. denied*, 493 U.S. 824, 110 S.Ct. 84, 107 L.Ed.2d 50 (1989). Generally, the pattern of these deals was for Paramount to sell a group of films to Film Writers Corporation ("Film Writers"), who turned around and resold individual films to the partnerships formed by Eisenberg.[1]

On May 26, 1979, Paramount sold Film Writers a package of seven films for an aggregate price of $114,787,400. For each of the seven films sold, the price included a combination of cash, short-term recourse notes, long-term recourse notes, and long-term nonrecourse notes. In addition, Film Writers paid a $350,000 fee to Walter E. Heller & Company ("Heller") to guarantee the seven long-term recourse promissory notes executed by Film Writers to Paramount, which totaled $34,436,220. The amount guaranteed by Heller would be reduced dollar for dollar by the total television revenues earned by the seven movies. At the time of the sale, Paramount had already negotiated an agreement with the American Broadcasting Company, Inc. ("ABC") to license five of the seven films sold to Film Writers. These five licenses totalled in excess of $38 million. Thus, less than a year later, when the television revenues had actually been collected, Heller's obligation under the guarantee expired.

Out of the aggregate purchase price for the seven films, $11,569,500 was for the film "North Dallas Forty." This price included $634,683 in cash during 1979; $1,735,000 in a short-term recourse note payable March 15, 1980; $3,471,000 in a long-term recourse note payable July 15, 1987; and $5,728,817 in a long-term nonrecourse note payable July 15, 1987.

On the same day as the sale from Paramount, Film Writers turned around and resold "North Dallas Forty" to a partnership named Regina Associates ("Regina"). Regina was formed among Eisenberg's fellow law partners, including Segal, at the firm of Levenfeld & Kanter. Regina paid $11,770,000 for the film, payable $2,570,183 in cash with the balance of $9,199,817 represented by a recourse promissory note which would convert to non-recourse upon the happening of one of two events: (1) the film realized $20,000,000 in worldwide gross receipts of which $10,000,000 came from foreign markets; or (2) the film realized $7,000,000 in non-theatrical gross receipts. "North Dallas Forty" was one of the two films not to have a network license agreement in place prior to sale, and in fact, Paramount did not commence negotiations with its eventual licensee, the National Broadcasting Company, Inc. ("NBC"), until after the film was sold to Regina. Finally, Regina was also required to pay interest of $122,317 in 1979 on its note to Film Writers. Regina's obligations under the agreement were partially fulfilled through Paramount's retention of a certain amount of the fees it owed Regina under the distribution agreement, which granted Paramount worldwide rights to the distribution, exhibition, exploitation and marketing of "North Dallas Forty." Each of the partners of Regina personally guaranteed that part of the note corresponding to that partner's interest in the partnership, up to 97% of the note.

Paramount and Film Writers both warranted under the terms of their respective agreements that "North Dallas Forty" would come with appropriate "cover," or alternate scenes of a movie when the scenes as originally shot contain too much vulgarity, nudity or profanity, so that the film could be broadcast by the networks in conformity with standards of the National Association of Broadcasters.[2] However, no such cover was pro-

---

1. Apparently, Paramount preferred to sell to a movie industry "insider," such as Film Writers, rather than directly to individual investors, in part due to its desire to avoid being labelled as an "issuer" under the securities laws. At the time, Gulf & Western, Paramount's parent company, was under investigation by the Securities and Exchange Commission.

2. Paragraph 1.11 of the purchase agreements between Paramount and Film Writers and be-

vided in this case. "North Dallas Forty" was a movie about the seamier side of professional football, and the director complained that producing alternate shots would have virtually required the production of another movie.

Despite the failure to produce appropriate cover, Paramount did succeed in licensing the film to NBC for $7,000,000 on June 18, 1980, approximately ten months after the film was released in the theatre.[3] NBC still retained the right to reject the film if further editing failed to satisfy NBC's broadcast standards. However, "North Dallas Forty" was eventually approved by NBC and shown on network television. As a result of the agreement, Regina met the non-theatrical income conversion test and its recourse note converted to nonrecourse when the television revenues were collected.[4] This nonrecourse note was never paid in its entirety. However, the $3,471,000 recourse note due Paramount was paid in full.

Regina reported substantial net losses in each of the years 1979 through 1982, a major portion of which came from depreciation deductions and investment tax credits from the film "North Dallas Forty." These losses were passed through to its partners, including Segal. Regina's depreciation deductions were calculated using a basis equal to the stated purchase price, $11,770,000, at which it acquired interest in the movie. The Commissioner disallowed these claimed deductions and Segal petitioned the Tax Court for review of the Commissioner's actions. After a full trial, the Tax Court allowed Regina's cash contribution in the amount of $3,092,500 included in its basis, but denied the amount in excess of the cash contribution, claiming its convertible note did not constitute a bona fide indebtedness. As a result, it held that Segal had income tax deficiencies for the years 1979 through 1982.

## II.

Initially, we note the basic principle that the Tax Court's findings of fact may not be disturbed on appeal unless they are clearly erroneous. *Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960); *Durkin,* 872 F.2d at 1275. The Tax Court's conclusions of mixed questions of fact and law, or the application of legal principles to a specific factual pattern, are also reviewed under the clearly erroneous standard. *Williams v. Commissioner,* 1 F.3d 502, 505 (7th Cir.1993).

Segal limits his argument on appeal to the claim that the Tax Court should have included, in addition to the cash contributed by Regina, an amount equal to the $3,471,000 recourse note executed by Film Writers to Paramount in Regina's basis in the film "North Dallas Forty."[5] He argues that the note was a bona fide indebtedness and should be included in the partnership's basis for the movie under the "at risk" rules in § 465 of the Internal Revenue Code.

In *Durkin,* which involved the acquisition of several movies by two partnerships, we addressed an issue almost identical to the one presented in this case. 872 F.2d at 1276. Depreciation deductions are allowed to investors who have placed capital at risk through the purchase of an asset used in trade or business or held for the production of income. I.R.C. § 167. However, when the debt used to purchase an asset is unlikely to be paid by the taxpayer, or is otherwise contingent, that debt does not represent a bona fide capital investment by the taxpayer and will be excluded from the depreciable basis of the asset. *Goulding v. United States,* 957 F.2d 1420, 1429 (7th Cir.1992); *Durkin,* 872 F.2d at 1276 (citing *Estate of*

---

tween Film Writers and Regina provided the following:

> SELLER shall deliver along with the PICTURE appropriate "cover" so that the PICTURE may be broadcast via television in conformity with the NAB [National Association of Broadcasters] standards.

3. The film had already been licensed to Home Box Office, Inc., ("HBO"), on November 7, 1979 for $2,180,000 to show it on cable television.

4. It is not clear exactly when the note converted. The movie was not accepted by NBC until late 1981 and Regina did not begin receiving funds from Paramount until 1982. All the funds were not paid until sometime in 1984.

5. The Tax Court decided eight issues. However, only two of these issues are before us on appeal.

*Baron v. Commissioner*, 83 T.C. 542, 550–553, 1984 WL 15617 (1984), *aff'd*, 798 F.2d 65 (2d Cir.1986)). We characterize debt as contingent in this manner when "the principal is to be paid solely out of exploitation proceeds, the loan is nonrecourse, shielding the taxpayer from personal liability, and the purchase price of the asset unreasonably exceeds its fair market value." *Durkin*, 872 F.2d at 1276 (citing *Towlinsky v. Commissioner*, 86 T.C. 1009, 1053–59, 1986 WL 22132 (1986)); *Upham v. Commissioner*, 923 F.2d 1328, 1335 (8th Cir.1991). Since it is axiomatic that substance controls over form for federal tax purposes, *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945), we examine the expectation of the parties and the structure of the transactions in determining whether the debt represents a bona fide capital investment. *Durkin*, 872 F.2d at 1277.

The Tax Court in *Durkin* found, as in this case, that the principal was to be paid solely out of exploitation proceeds and the purchase price of the asset unreasonably exceeded its fair market value. Thus, the critical question was whether the initial recourse nature of the convertible long-term notes should require the Commissioner to include the debt in Durkin's depreciable basis. We affirmed the finding of the Tax Court that the long-term notes did not qualify as bona fide indebtedness because the notes were "nearly certain" to convert to nonrecourse notes and the expectations of the parties reflected that the notes would not be enforced if the movies were unsuccessful. *Durkin*, 872 F.2d at 1277. Several of the notes were subject to conversion upon the receipt of any amount from syndicated television, and testimony at trial indicated that syndication was routine and could be expected for even a mediocre film. *Id.* The remaining notes, which were subject to conversion upon the receipt of between $4 and 6.5 million from non-theatrical sources, were also likely to convert be-cause network agreements-in-principle had already been signed for the films before they were purchased by the partnerships. Although these agreements left each note a few hundred thousand dollars away from conversion, it was "obvious" that cable television and syndication would make up the difference. *Id.* Furthermore, the structure of the transaction led the court to conclude that the parties did not expect to enforce the debt. Regina's note to Film Writers was recourse, but Film Writers' note to Paramount was nonrecourse, leaving Paramount and Film Writers little incentive to enforce the debt given that the recourse debt greatly exceeded the value of the rights acquired by the partnerships from Film Writers.

■ The central question in the instant case is whether the convertible recourse note was a bona fide indebtedness. The Tax Court found that there was a reasonable certainty that a television licensing agreement or agreements would be entered into for the movie, which, along with the revenue from cable television, would exceed the $7 million threshold for conversion.[6] While it acknowledged that there were valid concerns as to whether the film could be edited to meet national broadcast standards, this possible contingency was covered by the security of Paramount and Film Writers' warranties that the movie would be adaptable for television. The Tax Court concluded that the partners in Regina Associates would not have allowed themselves to be strung out with personal liability on a note in excess of $9 million without some certainty that their personal liability would terminate within a reasonably short period of time. Thus, it determined that the case was not factually distinguishable from *Durkin* and Segal could not include the note in his depreciable basis.

■ We agree with the Tax Court that this case is controlled by *Durkin*. The prin-

---

**6.** Segal argues that this finding that the note was "reasonably certain" to convert employed the incorrect legal standard. Rather, he contends that *Durkin* mandates a finding of "virtual certainty" before we can determine that the note is not a bona fide indebtedness. Setting aside the question of whether *Durkin* actually used that phrase, or whether there is any meaningful dif-ference between the two phrases, we reject the argument that a legal question is involved at all. Whether a note is unlikely to be paid by the taxpayer, and thus not a bona fide capital investment, is a question of fact for the Tax Court. *See Durkin*, 872 F.2d at 1276–77; *Upham v. Commissioner*, 923 F.2d 1328, 1335 (8th Cir.1991).

cipal, and perhaps strongest, distinction suggested by Segal is that in this case, unlike in *Durkin*, there was no network agreement in place for "North Dallas Forty" before the film was acquired, nor were there negotiations with NBC before acquisition. Given the admitted editing problems the film had due to its vulgarity and nudity, this was not a mere formality. However, five of the seven movies had been licensed to networks prior to May 26, 1979, all at amounts which would meet or exceed $7 million. The evidence indicated that "North Dallas Forty" could expect to receive an amount from network licensing commensurate with these other agreements. Moreover, the Tax Court found that Paramount was working on a licensing agreement for "North Dallas Forty" during 1979 when the transactions took place. Eisenberg was fully informed of the progress of these negotiations at that time and gave optimistic reports to Regina's partners about the prospects for a network agreement. Thus there is ample evidence in the record to establish that there was a reasonable certainty a network agreement would be signed and the note would convert.

The movie's lack of cover does not alter this conclusion. While this contingency may have decreased the chances for a network agreement, Regina was amply protected by the warranty provided in its purchase agreement. If a network agreement fell through, it would likely be due to the lack of cover, which would allow Regina to reject or revoke its acceptance of the film altogether, or rescind the purchase agreement in a breach of warranty action. Certainly this warranty could not be invoked at any time up until the expiration of the note in 1987. However, at the time the purchase agreement was signed, it provided Regina with almost complete security against the failure of the film to be licensed to a network due to its inability to meet broadcast standards. When the film was released theatrically without cover in August, Regina still had a reasonable time under New York's version of the Uniform Commercial Code to revoke its acceptance of nonconforming goods after it had discovered or should have discovered the ground for

revocation.[7] N.Y.Uniform Commercial Code Law § 2-608 (McKinney's 1994). A few weeks after the theatrical release, though, Frank Yablans, the producer of "North Dallas Forty," advised Film Writers' president, John Heyman and Regina's Eisenberg that Paramount was negotiating a network license agreement of between $7 million and $8 million for the movie. This implied that Paramount believed the film was adaptable for television, or that Paramount had seasonably effected a cure, both possibilities extending the time in which it was reasonable for Regina to wait before protesting the film's lack of cover. *Id.* More importantly, Regina's failure to exercise its rights with respect to the lack of cover corresponded with the growing certainty, reflected in the reports of impending network and cable deals, that the movie would be licensed to a network at an amount which would meet or exceed the threshold for conversion. Regina's position was at least as safe as the taxpayer in *Durkin* who relied on agreements-in-principle which were subject to change. As the protection of the warranty became arguably weaker, the certainty of obtaining a network agreement became greater, and the Tax Court was entitled to conclude that, given the confluence of these two factors, there was never a serious risk that the note would be paid by Regina or its partners.

As in *Durkin,* the Tax Court bolstered this conclusion with its finding that the parties never expected to enforce the note against Regina. The president of Film Writers testified that its net worth was negligible in comparison to the overall amount of the debt, making it unlikely that Paramount would ever attempt to collect on Film Writers' note. Moreover, while Segal is correct that Heller might have enforced the debt if it was called on to fulfill the obligations of its guarantee, the Tax Court found that Heller's guarantee terminated very shortly after it was executed due to the five network agreements already signed before purchase. Even if Film Writers or Heller was called on to pay the note, both would be relieved of their obligations by Paramount's failure to provide a film which

---

**7.** The purchase agreements between Paramount and Film Writers, and Film Writers and Regina,

provided that they would be interpreted according to New York law.

conformed to national broadcasting standards. Alternatively, if the film was adaptable, then the note would have converted. Either way, the structure of the transactions still creates only the form, rather than the substance, of a bona fide capital investment. Therefore, the change in the structure of the transactions from *Durkin,* in which Film Writers' note to Paramount was always nonrecourse, to the instant case in which Film Writers' note was recourse under the same terms as Regina's note,[8] did not make the debt any more likely to be enforced against the individual partners of Regina.[9]

The Tax Court's finding that Regina was unlikely to ever pay the note was amply supported by the record and we will not disturb that finding on appeal. The note, therefore, was not a bona fide capital investment and the Tax Court properly excluded it from Segal's depreciable basis.[10]

### III.

For the reasons above, the decision of the Tax Court is

AFFIRMED.

---

8. This suggested distinction accounts for why Segal only seeks on appeal to add an amount equal to the $3,471,000 recourse note from Film Writers to Paramount. The nonrecourse portion of Film Writers' debt is indistinguishable from *Durkin.*

9. We also agree with the Tax Court's determination that the status of Regina as a general partnership does not increase the individual liability of its partners over the partners in *Durkin,* since, in both cases, the partners personally guaranteed the obligations.

10. Given this result, we need not consider the question of whether Segal was "at risk" under I.R.C. § 465.