T.C. Memo. 1996-318

UNITED STATES TAX COURT

CHARLES R. BOWDEN AND SUE I. BOWDEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14318-93.                    Filed July 15, 1996.

Charles R. Bowden and Sue I. Bowden, pro sese.

<u>Lisa W. Kuo</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies in and additions to petitioners' Federal income tax, and an accuracy-related penalty as follows:

| | | Additions to Tax | | | | Penalty |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 | Sec. 6662(a) |
|---|---|---|---|---|---|---|
| 1986 | $41,891 | $10,473 | $2,095 | [1] | $10,473 | --- |
| 1989 | 42,764 | 10,691 | --- | --- | --- | $8,553 |

[1] 50 percent of the interest due on $41,891.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

After concessions, the issues remaining for our consideration are: (1) Whether petitioners are entitled to depreciation deductions of $154,986 and $207,060 for their 1986 and 1989 taxable years, respectively; (2) whether petitioners are entitled to other Schedule C deductions for 1986 and 1989; (3) whether petitioners failed to include income of $163,001 and $72,817 received during their 1986 and 1989 tax years, respectively; (4) whether petitioners are liable for self-employment tax on any part of the $163,001 and $72,817 amounts; (5) whether petitioners are liable for an addition to tax for negligence under section 6653(a)(1)(A) and (B) for 1986 and the accuracy-related penalty under section 6662(a) for 1989; (6) whether petitioners are liable for the substantial understatement addition to tax under section 6661 for 1986, and (7) whether petitioners are liable for the late filing addition to tax under section 6651(a)(1) for 1986 and 1989.[1]

_____

[1] The notice of deficiency reflects an investment tax credit carryforward issue involving $98,660 for 1986. Since the time of the pleadings, the parties have not addressed this issue. Therefore, for purposes of this case, the investment tax credit
(continued...)

FINDINGS OF FACT[2]

Petitioners resided in Laguna Hills, California, at the time their petition was filed. Petitioners' 1986 Federal income tax return was filed on July 29, 1988. Petitioners' 1989 Federal income tax return was filed during October 1990.[3] Charles R. Bowden and Sue I. Bowden were the sole officers and shareholders of approximately 12 corporations.[4] Petitioners and their corporations were primarily engaged in the business of buying, selling, financing, and operating water vending machines (vending machines). These vending machines purified water by reverse osmosis.

Mr. Bowden, as president of each corporation (with the exception of C.B. Crest), managed the salespeople, promoted

---

[1](...continued)
carryforward issue is deemed conceded by petitioners. See Rule 142.

[2] The parties' stipulations of facts and exhibits are incorporated by this reference.

[3] The filing date on petitioners' 1989 return is clear as to the month and year (Oct.--1990) but the exact day is not clear. Petitioners signed their 1989 return on Oct. 14, 1990.

[4] For our purposes, the corporations involved in this case included but were not limited to: (1) Purified Water Inv. Corp. (PWIC); (2) Purified Water Manufacturing Corp. (PWMC); (3) Aqualator Vending Corp. (AVC); (4) Aqualator Intl. Corp. (AIC); (5) Aqualator Serv. Corp. (ASC); (6) Aqualator Manufacturing Corp. (AMC); (7) Aqualator R&D Corp. (Aqualator R&D); (8) C.B. Crest, Inc. (C.B. Crest); (9) Septech, Inc. (Septech); (10) Pac-Tech Capital Corp. (Pac-Tech); and (11) The Water Doctor, Inc. (Water Doctor, Inc.).

public relations, and arranged and negotiated various financing agreements with financial institutions concerning the vending machines. Mr. Bowden was named president and secretary of PWIC on April 10, 1987.

As a corporate officer, Mrs. Bowden's primary activity was to maintain the corporate bank accounts by reviewing the cash balances on a daily basis. She also performed such tasks as the disbursing of funds, signing of checks, and transferring of funds between corporate accounts. Mrs. Bowden held the position of president of C.B. Crest, and she was president, secretary, and chief financial officer of PWIC from June 11, 1985, until April 10, 1987.

Mr. Bowden had worked as an accountant, controller, and management consultant before becoming self-employed. He received a bachelor's of business administration in accounting and a master of sciences in accounting. However, he had not practiced as an accountant for many years. Mrs. Bowden is a bookkeeper.

PWIC and PWMC

Petitioners incorporated PWIC and PWMC for the purpose of consolidating the operations of AVC, ASC, AIC, and Aqualator R&D.[5] In connection with the consolidation, the Aqualator corporations were not dissolved. PWIC was on a fiscal year ending April 30.

---

[5] Collectively referred to as the Aqualator corporations.

During its 1986 fiscal year, PWIC leased and occasionally sold vending machines for home, office, and commercial water purification use.  During 1986, PWIC operated 490 vending machines and collected the revenues and incurred expenses in connection with the machines.

During the years under consideration, PWIC made payments to petitioners and paid certain of their expenses, as follows:

| Payee | Amount | Stated Reason | Date |
|---|---|---|---|
| Mrs. Bowden | $6,700.00 | Auto expenditures | June 1986 |
| Mrs. Bowden | 579.92 | Entertainment | July 1986 |
| Transamerica Occidental Life Ins. Co. | 1,500.00 | Life Ins. policy for Mr. Bowden | July 1986 |
| Mrs. Bowden | 700.00 | Travel | Oct. 1986 |
| Mrs. Bowden | 500.00 | Interco-Aqualator Serv. | Oct. 1986 |
| Transamerica Occidental Life Ins. Co. | 1,500.00 | Life Ins. policy for Mr. Bowden | Nov. 1986 |
| Crocker Natl. Bank | 11,495.98 | For Mrs. Bowden | 1986 |
| Pentech Financial Servs. | 1,590.00 | For Mrs. Bowden | 1986 |
| San Bernardino County tax collector | 353.00 | For Mrs. Bowden | 1986 |
| Mrs. Bowden | 12,346.67 | Unidentified | 1986 |
| Mr. Bowden | 399.56 | Entertainment | Dec. 1986 |
| Mrs. Bowden | 500.00 | Consulting fee | Dec. 1986 |
| VISA | 7,314.58 | Mr. Bowden's credit card bill | 1986 |
| American Express | 447.63 | Mr. Bowden's credit card bill | 1986 |
| American Express | 4,548.81 | Mr. Bowden's credit card bill | 1989 |
| American Express | 3,858.61 | Mr. Bowden's credit card bill | 1989 |
| Newport Vending[1] | 44,250.00 | Mrs. Bowden | 1989 |
| Mrs. Bowden | 4,100.00 | Salary | 1989 |

[1] Newport Vending is a partnership between Mr. Bowden's brother, Hollis Bowden, and Cathy M. Smith Handel, Mrs. Bowden's daughter.

Petitioners provided respondent with PWIC's general ledgers for the periods:  (1) May 1 through December 31, 1986;

(2) January 1 through May 21, 1989; and (3) the month of October 1989. Petitioners did not provide respondent with PWIC's general ledgers for the periods: (1) June 1 through September 30, 1989; and (2) November 1 through December 31, 1989.

Petitioners provided respondent with PWIC's canceled checks from May 29 through December 31, 1986. Petitioners did not provide respondent with PWIC's canceled checks from January 1 through December 31, 1989.

C.B. Crest

Petitioners purchased C.B. Crest with the intention of consolidating or merging the Aqualator corporations into it. No consolidation or merger took place.

During the 1989 fiscal year, C.B. Crest used the assets of the Aqualator corporations. C.B. Crest rented out and occasionally sold vending machines, as well as home, office, and commercial water purification systems. In 1989, C.B. Crest operated (including collecting the revenues and paying the expenses) 551 water vending machines.

C.B. Crest paid petitioners the following amounts during the taxable year 1989:

| Payee | Amount | Reason | Date |
|-------|--------|--------|------|
| Mrs. Bowden | $16,710.83 | Unidentified | Jan.-July 1989 |
| Mrs. Bowden | 105.04 | Postage | Jan. 1989 |
| Mrs. Bowden | 127.02 | Rent | July 1989 |
| Mrs. Bowden | 51,679.84 | Salary | Jan.-July 1989 |

Mr. Bowden  17,479.84  Salary   Jan.-July 1989

Petitioners provided respondent with C.B. Crest's general ledgers for the periods:  (1) January 1 through July 31, 1989; (2) parts of the month of August 1989; and (3) the month of October 1989.  Petitioners did not provide respondent with C.B. Crest's general ledgers for:  (1) Parts of the month of August 1989, and (2) the months of September, November, and December 1989.  Petitioners provided respondent with C.B. Crest's canceled checks for January 1 through July 26, 1989.

Aqualator Vending Corp. (AVC)

Between January 1 and June 31, 1986, Mrs. Bowden received $1,500 from AVC.  The amount was paid in five checks. Petitioners provided respondent with AVC's general ledgers for January 1 through July 31, 1986.  Petitioners did not provide respondent with AVC's general ledgers for the periods: (1) August 1 through December 31, 1986; and (2) January 1 through December 31, 1989.

Petitioners did not provide respondent with AVC's canceled checks for the periods:  (1) May 17 through December 31, 1986; and (2) January 1 through December 31, 1989.

Transactions

During the years under consideration, petitioners and their various corporations were involved in transactions with Ocean Leasing (Ocean Leasing), MDFC Equipment Leasing Corp. (MDFC),

Bank of Whittier, National Bank of Southern California (NBSC), Southern Pacific Thrift and Loan (Southern Pacific), and Concordia Federal Bank for Savings (Concordia Bank). Each of these entities lent funds to petitioners and their corporations. Mr. Bowden was personally involved in the negotiations and arrangements for the loan transactions. Petitioners were involved in about 200 lawsuits involving their corporations, vending and water purifier activity, and loans.

### 1. Ocean Leasing

In 1983, petitioners, through their proprietorship, Vista Vending, entered into an agreement to lease two vending machines from Ocean Leasing. Originally, AVC sold the vending machines to Ocean Leasing. Petitioners claimed a $6,996 depreciation deduction for the vending machines on their Schedule C for Vista Vending on the 1984 and 1985 tax returns.

### 2. MDFC

On September 12, 1984, AIC and Septech, petitioners' corporations, entered into a transaction with a company, MDFC. This transaction involved 10 vending machines. On the same date, MDFC paid $167,000 to Septech for the 10 vending machines, and then leased them to AIC for a 60-month period. At the end of the lease, AIC had the option to purchase the machines for fair market value. Prior to the MDFC lease, Septech sold the 10

vending machines to AIC.  When the MDFC lease occurred, AIC gave the same 10 vending machines to Septech to sell to MDFC.

In 1986, MDFC sued petitioners and their corporations for defaulting on the MDFC lease.  On August 27, 1986, a settlement favoring MDFC was entered by the California superior court. Under the settlement, MDFC was to receive:  (1) $199,000, (2) possession of the 10 vending machines in question, and (3) a second priority judgment lien on property owned by petitioners in San Bernardino County.  The $199,000 was payable $10,000 on or before July 15, 1986, and $3,150 per month for 60 months, beginning August 1, 1986.  During October 1989, MDFC filed papers in court reflecting full satisfaction of the settlement in the California superior court.

On September 20, 1989, MDFC's lawyers wrote to Arthur Handel (Mr. Handel), petitioners' attorney, indicating that upon the payment of the personal property taxes escrow amounts, "your client will be the owner of the Aqualator vending machines originally leased."  On October 18, 1994, MDFC informed Mr. Bowden by letter that he was entitled to possession of the 10 vending machines as part of the satisfaction of judgment between MDFC and AIC.  MDFC also stated that it did not take possession of the vending machines.  MDFC by an October 25, 1994, letter advised respondent's agents that MDFC's judgment against AIC and petitioners had been fully satisfied on September 6, 1989.  As a

result of the satisfaction, petitioners retained possession and title to the equipment.

   3.  <u>Bank of Whittier</u>

On August 20, 1985, the Bank of Whittier loaned petitioners $250,000.  On January 15, 1986, petitioners gave the Bank of Whittier a security interest in 16 vending machines to secure the loan.  The Bank of Whittier caused notice of the security interest to be filed under provisions of the California Uniform Commercial Code.  According to the security interest documents, petitioners' corporations owned the vending machines.  The loan was guaranteed by the corporations and, ultimately, was defaulted.

On February 24, 1986, petitioners and the Bank of Whittier agreed that the $241,066.01 unpaid principal loan balance would be satisfied from a new loan to be issued to Mrs. Bowden and guaranteed by Mr. Bowden.  In turn, the Bank of Whittier released all corporate guaranties and assigned its security interest in the 16 vending machines to Mrs. Bowden.  Also pursuant to the same agreement, Mrs. Bowden assigned her one-third interest in LBJ Properties to the Bank of Whittier.[6]  The settlement agreement is silent as to the ownership of the vending machines. Payments on this loan were made by petitioners individually and

---

[6] The record does not otherwise divulge further information about LBJ Properties.

by their corporations.  As of the time of the commencement of this case, the new loan to Mrs. Bowden remained outstanding.

4.  <u>NBSC</u>

In 1985 and 1986, petitioners' corporation Pac-Tech obtained a loan from NBSC.  NBSC took, as security, assignments on a number of the vending machine leases.[7]  Funds were disbursed to Pac-Tech in return for the assignments.  Pac-Tech defaulted on the notes.

On February 24, 1986, petitioners agreed with NBSC to pay the outstanding loan balance of $442,595.29 with a new loan issued to Mrs. Bowden and guaranteed by Mr. Bowden.  Mrs. Bowden assigned her interest in the 1 Crestwood Drive, Newport Beach property (Crestwood property) to NBSC via a deed of trust.  In return, NBSC agreed to release all corporate guaranties.  Paragraph 6 of the settlement agreement states:

> Bank will release to Hollis Bowden its security
> interest in 41 water vending machines and 3rd party
> leases presently held as collateral for the original
> obligation.

On February 25, 1986, Hollis Bowden, who is the brother of petitioner Charles R. Bowden, executed an agreement subordinating

_____

[7] A typical lease submitted for the record states that AVC is the "supplier of equipment".  Pac-Tech is denominated as "lessor" and "secured party".  An unrelated third party is "lessee".  NBSC is the "assignee" of the "secured party".

his lien on the Crestwood property in favor of NBSC.[8]  On the same date, NBSC recorded its security interest on the Crestwood property.  Subsequently, Hollis Bowden transferred the security interest in the 41 vending machines to petitioners in return for stock in the Aqualator corporations.

On October 19, 1994, NBSC notified petitioners that its records showed payment in full of the $442,595 secured by "a lien on your home and 41 vending machines".  On October 20, 1994, NBSC advised petitioners that the bank's records indicated that the "lien" on the 41 vending machines was transferred, along with an assignment of certain lease proceeds, to Hollis Bowden.

Clement Smith (Mr. Smith), a senior commercial lending officer for NBSC, believed that when NBSC took assignments from Pac-Tech on a number of leases, the financial institution became the owners of the leases.  It was Mr. Smith's belief that the lease documents conveyed ownership to NBSC.  Mr. Smith believed that by filing a security interest on the vending machines NBSC acquired a titled interest.  Mr. Smith also believed that NBSC was entitled to take depreciation on the vending machines in question.  He also stated that NBSC had the right to sell the vending machines, absent default on the part of petitioners, to third parties.

---

[8] On Oct. 29, 1985, Hollis Bowden had given Mr. Bowden special power of attorney over his interest in the Crestwood property.

5. <u>Southern Pacific</u>

On December 28, 1984, Southern Pacific agreed to purchase vending machine leases between Pac-Tech and various third parties. Monthly rentals were to be collected by Pac-Tech, which would in turn remit them to Southern Pacific. In early 1985, Southern Pacific, pursuant to the agreement, purchased assignments to approximately 40 leases. Each lease was for a term of 5 years and provided for $437 monthly rental payments. Each lease provided that, in the event of default, the entire balance due under the lease could be accelerated. Mr. Bowden guaranteed the payment of the leases.

On June 30, 1986, Southern Pacific lent $554,417.61 to Pac-Tech. The revenue from the vending machines, however, was not sufficient to make the monthly lease payments. Consequently, the deficiency grew each month. At some point, the leases went into default.

Subsequently, Southern Pacific renegotiated the debt, including the pledge of approximately 100 vending machines as collateral. Southern Pacific filed a security interest for each vending machine.

Christopher Forman (Mr. Forman), then acting president of Southern Pacific, believed that it had purchased a stream of payments on individual leases. Mr. Forman thought that Southern Pacific was entitled to collect all or a portion of the payments

that were being made by the lessees on the equipment. It was Mr. Forman's understanding that Southern Pacific's purchase of the vending machine leases was the same as obtaining a titled lien interest on a motor vehicle through the certificate of ownership. In other words, Southern Pacific would be seen as the lienholder on the equipment. Any rights Southern Pacific had in the purchased leases would come into play only if there was a default by the individual lessee on the lease payments.

On July 16, 1987, Prudential Bancorp, as an assignee of Southern Pacific, sued petitioners, alleging that petitioners were liable for an amount in excess of $550,000 on personal guaranties furnished to Southern Pacific. On June 30, 1989, petitioners offered the Crestwood property to Prudential Bancorp in exchange for extinguishment of liens, unpaid taxes, and satisfaction of Prudential Bancorp's claims. On September 15, 1989, petitioners conveyed the Crestwood property to Prudential Bancorp. Under the settlement stipulation, Prudential Bancorp was entitled to the proceeds from the sale of the Crestwood property, which it sold to unrelated third parties for $2,525,000. Prudential Bancorp used the proceeds to satisfy the Southern Pacific loan, the NBSC loan, a $1.4 million loan from Concordia Bank, the debt owed to Hollis Bowden, and all mechanic's liens.

On August 21, 1989, petitioners' attorney, Mr. Handel, wrote to Prudential Bancorp's attorney to confirm his understanding that pursuant to the settlement, Prudential Bancorp would "immediately release any and all interests" in the vending machines.

6. Crestwood Property

Petitioners purchased the Crestwood undeveloped land during 1983 for $375,000 and in 1984 borrowed $1.4 million from Concordia Bank to construct a residence. Concordia Bank received a security interest in the Crestwood property. Petitioners completed construction of a 12,000-square-foot, three-story, four-car-garage residence in October 1986.

The Crestwood property was flooded twice during December 1987. On or about December 6, 1987, a few days after petitioners moved in, sewage backed up, contaminating the first floor of the house. Within a week, a windstorm caused flooding and wind damage to the property. For example, it blew out all the windows in the house.

During June 1988, another flooding incident occurred at the Crestwood property. The floods destroyed some of petitioners' personal and corporate records as well as personal property. The destroyed records were discarded by workers who were cleaning up the flood damage.

On or about December 6, 1987, petitioners filed a claim with their insurance company for damage caused by the sewer backup. Petitioners received $48,480 in satisfaction of their claim. On or about December 16, 1987, petitioners filed a second claim with their insurance company for flood damage caused by rain. The insurance company paid petitioners $75,200 to satisfy their second claim. On or about June 15, 1988, petitioners filed the third claim for alleged vandalism that caused interior damage to their home. Petitioners received $135,626 in satisfaction of that claim.

Finally, petitioners filed an insurance claim for loss of corporate papers in connection with the floods. Petitioners received $25,000 in satisfaction for corporate records stored in a portion of their residence leased to one of their corporations. The loss of the corporate papers was not covered under petitioners' homeowner's policy.

Petitioners reported on their 1986 Schedule C gross receipts of $163,001 and deductions for: Insurance--$100, mortgage interest--$69,860, taxes--$340, and contract labor expenses-- $69,850. Petitioners' reported, on their 1989 Schedule C gross receipts of $72,817 and deductions for: Insurance--$7,945, mortgage interest--$65,639, taxes--$8,050, and repairs--$14,490.

Petitioners' attorney, Mr. Handel, believed that the settlement agreements with the financial institutions provided

that title and ownership of the vending machines passed to petitioners or their various corporations.[9]  Mr. Handel contended that it was "always clear" that these financial institutions had no interest in the machines other than obtaining paybacks of loans.  Mr. Handel believed that either petitioners or their corporations would have the right to pursue a stolen vending machine.

## OPINION

The controversies here, to a great extent, focus on the ownership of numerous water purification machines leased, sold, and used for business purposes by petitioners' corporations.  The questions are substantially factual and have been complicated because of petitioners' relationships with their numerous interrelated corporate entities.  This case is further complicated by a myriad of transactions, including sales, sales and lease backs, loans and security interests, and other interrelated transactions and settlements of controversies and lawsuits.  The absence of business records (both corporate and individual) for key periods further exacerbates the situation.  The record in this case is patchy and, in many instances, vague.

Respondent determined that petitioners were not entitled to deduct expenses claimed on the Schedules C attached to their 1986

---

[9] Mr. Bowden waived the attorney-client privilege so that Mr. Handel could testify before this Court.  Also, it appears that Mr. Handel is Mr. Bowden's son-in-law.

and 1989 income tax returns. Respondent challenges the claimed depreciation with respect to certain vending machines because petitioners failed to establish their ownership of or basis in those machines. In that same vein, respondent also determined that petitioners are not entitled to certain other deductions related to the vending machines for the 1986 and 1989 tax years. Respondent also determined that petitioners failed to report income paid to them by or on their behalf by their corporations. Conversely, petitioners contend that they are entitled to depreciate, as well as to deduct all related expenses with respect to, the vending machines in question.

A. Depreciation

Petitioners contend that the assignments of security interests in the vending machines gave them title and, therefore, ownership. Consequently, petitioners contend that in 1986 they owned approximately 70 out of the 490 vending machines operated by their corporations.

Respondent counters that: (1) Petitioners have no capital investment in the vending machines; (2) there are no documents in the record which prove that petitioners owned the vending machines; and (3) the vending machines have not been shown to have a useful life exceeding 1 year.

Deductions are a matter of legislative grace, and the taxpayer bears the burden of proving that he or she is entitled

to any claimed deductions.  Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. 111, 115 (1933).  This includes the burden of substantiating the amount and purpose of the item claimed.  Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976); sec. 1.6011-1(a), Income Tax Regs.

Section 167 provides, in part, for a depreciation deduction with respect to property used in a trade or business. Depreciation allows the taxpayer to recover the cost of the property used in a trade or business or for the production of income.  United States v. Ludey, 274 U.S. 295, 300-301 (1927); Durkin v. Commissioner, 872 F.2d 1271, 1276 (7th Cir. 1989), affg. 87 T.C. 1329 (1986).

"'[D]epreciation is not predicated upon ownership of property but rather upon an investment in property.'"  Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1976) (quoting Mayerson v. Commissioner, 47 T.C. 340, 350 (1966) (emphasis added)), affg. 64 T.C. 752 (1975); see also Helvering v. F. & R. Lazarus & Co., 308 U.S. 252 (1939).  The taxpayer who is entitled to the depreciation deduction is the one who suffers the economic loss of his investment by virtue of the wear and tear or exhaustion of the property--the one who has the economic benefits and burdens of ownership.  Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Leahy v. Commissioner, 87 T.C. 56

(1986).  Consequently, a stockholder normally is not entitled to depreciate property of his corporation because he lacks a direct economic interest or investment in the property itself.  See Hunter v. Commissioner, 46 T.C. 477, 489-490 (1966).

Generally, a taxpayer's capital investment in the property is the cost of acquiring the depreciable property.  See Durkin v. Commissioner, supra; secs. 167(c), 1011, 1012; sec. 1.1012-1(a), Income Tax. Regs.  Petitioners contend that their depreciable basis is derived from the lenders' assignments to them of security interests in the property.  This presents a question of whether, under State law, a security interest affords petitioners an ownership interest sufficient to entitle them to claim depreciation.

State law is determinative of the parties' rights and interests, and Federal law is determinative of the Federal income tax consequences of those rights or interests.  Morgan v. Commissioner, 309 U.S. 78, 80 (1940); Lucas v. Earl, 281 U.S. 111 (1930); Sampson v. Commissioner, 81 T.C. 614, 618 (1983), affd. without published opinion 829 F.2d 39 (6th Cir. 1987).

Generally, California law provides that a security interest in personal property is given to secure a payment or performance of an obligation and not to acquire personal property.  See Cal. Com. Code sec. 1201(37)(a) (West Supp. 1996).  The holder of a security interest is denominated a secured party.  The priority

of a secured party's security interest in collateral is dependent on the time of filing a financing statement in relation to the filing of other secured interests. See generally Cal. Com. Code secs. 9302, 9312, 9105(m), 9401 (West 1990).[10] The purpose of a financing statement is to inform existing or prospective creditors of the extent to which an existing or prospective debtor has encumbered assets. Borg-Warner Acceptance Corp. v. Bank of Marin, 111 Cal. Rptr. 361 (Ct. App. 1973).

Petitioners and their corporations have engaged in a series of transactions prior to defaulting on several loans. The vending machines owned by petitioners' corporations were the security for the loans. Petitioners and the financial institutions entered into settlement agreements in which the security interests were assigned from the lenders to petitioners.[11]

---

[10] California law provides that a financing statement is a document which satisfies the requirements of Cal. Com. Code sec. 9402(1) (West 1990). This section provides:

> A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor, and contains a statement indicating the types, or describing the items, of collateral. * * *

[11] In the settlement with NBSC and petitioners, the security interests were assigned from NBSC to Hollis Bowden, who in turn assigned them to Mrs. Bowden. In some of the settlement

(continued...)

Petitioners argue that those security interests provide them with an ownership interest in the vending machines. Generally, a security interest is not equivalent to a capital investment. Helvering v. F. & R. Lazarus & Co., supra; see Cal. Com. Code sec. 1201(37)(a). The security interests provided petitioners with an interest in property designed to secure the payment or performance of an obligation. A security interest does not, without further action, transfer title or an ownership interest in property. Moreover, the assignment or release of a security interest eliminates the secured party's ability (in this case the financial institutions) to take possession of the property in the event of default. Additionally, a security interest is not the equivalent of "cash or other property" used to acquire the property.[12] See sec. 1.1012-1(a), Income Tax Regs.

The transfer of the Crestwood property to Prudential Bancorp pursuant to the settlement agreement did not create a capital investment in the vending machines. Instead, it resulted in an exchange or sale of that property, as discussed infra pp. 30-33. Prudential Bancorp received the Crestwood property in exchange

---

[11](...continued)
agreements, petitioners provided property or funds in exchange for the assignment of security interests in the vending machines.

[12] This would be so even though, as part of the settlement agreements in which petitioners received assignment of the security interests, they did give cash or property to the financial institutions.

for the release of petitioners' obligations to the financial institutions. No vending machines were transferred to petitioners in exchange for the Crestwood property.

It is significant that petitioners have failed to substantiate their ownership of the vending machines. They have not been able to demonstrate that through their proprietorship, Vista Vending, they owned the vending machines leased from Ocean Leasing and, thus, were entitled to claim depreciation. Petitioners also argue that there were corporate agreements that transferred ownership of the vending machines from their corporations to them in the event that petitioners were required to pay on their guaranties of corporate debt. Petitioners contend that the records lost in connection with the floods provided that petitioners would be entitled to the vending machines if they paid corporate debts pursuant to individual guaranties. Alternatively, petitioners allege the existence of oral agreements that would have accomplished the same result. Petitioners have also argued that their corporations did not depreciate the vending machines as proof of the existence of the oral agreements. In this regard, some of petitioners' corporations' returns are in the record. A review of those returns reflects an inconsistent pattern where depreciation on vending machines was claimed in some years and not in others. This evidence is inconclusive.

In the absence of direct evidence, we could consider credible, secondary evidence. <u>Malinowski v. Commissioner</u>, 71 T.C. 1120, 1125 (1979). The only evidence offered by petitioners to carry their burden is their own testimony. We found Mr. Bowden's testimony on this subject to be vague, conclusory, uncorroborated, and in many respects, contradictory.[13]

Petitioners' attorney, Mr. Handel, did not know who owned the machines after the Prudential Bancorp transaction.[14] Mr. Handel disclaimed any personal knowledge of the agreements or their purported contents.

Petitioners also relied on a September 20, 1989, letter from the law firm of Glass, Alper, Goldberg & Cohn, which contains a statement that ownership of the vending machines will vest in Mr. Handel's client. This letter, by itself, is inconclusive

---

[13] In an effort to establish their ownership of the machines, petitioners attempted to introduce into evidence "re-creations" of these purportedly lost documents. At trial, we held that those documents were not admissible because they were hearsay.

[14] The following exchange between respondent's counsel and Mr. Handel is instructive:

Q: Okay. And are there any documents showing that the ownership went to the * * * [petitioners] -- clearly stating ownership went to the * * * [petitioners]?

A: No. I don't think so. I think they only alluded to. There is a release of the UCC interest in the machines by MDFC.

Respondent followed the same line of questioning with various financial institutions with consistent responses by Mr. Handel.

because Mr. Handel's clients consisted of petitioners and their corporations. Our conclusion is also supported by the October 25, 1994, letter written by MDFC to respondent's agents that contains the statement that the judgment against AIC <u>and</u> petitioners was satisfied on September 6, 1989. We believe that the essence of these letters is that the financial institutions regarded petitioners as the officers and shareholders of their wholly owned corporations.

We found Mr. Forman's (the acting president of Southern Pacific) testimony to be both credible and consistent with California law and the record. He characterized Southern Pacific's rights or interest in the vending machines as those of the holder of a security interest that could develop into a possessory or other property interest upon default on the lease payments. See generally Cal. Com. Code sec. 1201(37)(a). On the other hand, Mr. Smith (a senior commercial lending officer for NBSC) testified that NBSC became the owner of certain leases that were assigned to it through transactions with petitioners' corporations. Mr. Smith misconstrued the effect and character of the transactions between NBSC and petitioners' corporation. NBSC possessed nothing more than any other security holder involved as a lender with petitioners' corporations. The assignment of the leases was to provide a source of repayment of outstanding loans.

Finally, petitioners submitted a confused jumble of corporate records that have not been properly organized, reconciled, or explained. For example, PWIC's records for 1989 extend only from January through May 21 and for the month of October. The record reflects that petitioners were paid $25,000 by the insurance company for missing corporate documents in a room leased to one of their corporations at the Crestwood property.[15] However, in this instance, we are confronted with a multiplicity of missing documents from three different corporations owned by petitioners.

Under these circumstances, petitioners' testimony, without further corroboration, is insufficient to carry petitioners' burden. See Geiger v. Commissioner, 440 F.2d 688, 689 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Mills v. Commissioner, 399 F.2d 744, 749 (4th Cir. 1968), affg. T.C. Memo. 1967-67; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

We hold that petitioners have failed to prove their ownership of and/or depreciable basis in the vending machines and that respondent's determination regarding the depreciation is sustained.[16]

---

[15] The record is silent about which corporation leased the room in the Crestwood property.

[16] Our holding negates the need to reach respondent's argument that petitioners have not shown that the vending machines have a useful life exceeding 1 year.

B.  Failure To Substantiate Other Schedule C Deductions

Petitioners contend that in 1986 and 1989, they owned certain vending machines from which their corporations collected the revenue.  In connection with those vending machines, petitioners claimed the operating and related expenses.  Respondent determined that petitioners are not entitled to deductions.

Section 162(a) allows a deduction for "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  See also sec. 1.162-1(a), Income Tax Regs.

Taxpayers are required to maintain records that are sufficient to enable the Commissioner to determine their correct tax liability.  See Meneguzzo v. Commissioner, 43 T.C. 824, 831-832 (1965); sec. 6001; sec. 1.6011-1(a), Income Tax Regs.  Also, the taxpayer bears the burden of substantiating the amount and purpose of the item claimed.  Hradesky v. Commissioner, 65 T.C. at 90; sec. 1.6001-1(a), Income Tax Regs.  Under certain circumstances, if a taxpayer establishes the entitlement to a deduction but does not establish the amount of the deduction, we may estimate the amount allowable.  Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).

Finally, "the trade or business of the corporation must be considered separately from the trade or business of the

shareholders." Markwardt v. Commissioner, 64 T.C. 989, 995 (1975).

Petitioners on their 1986 Schedule C claimed deductions for: Insurance--$100, mortgage interest--$69,860, taxes--$340, and contract labor--$69,850. Petitioners, on their 1989 Schedule C claimed deductions for: Insurance--$7,945, mortgage interest-- $65,639, taxes--$8,050, and repairs--$14,490.

Petitioners have not demonstrated that the expenses were incurred for the vending machines that petitioners have claimed they owned. The record does not reflect that the expenses were paid or incurred during the tax years 1986 and 1989. In addition, petitioners have not shown that any such items were ordinary and necessary business expenses. Sec. 1.162-1(a), Income Tax Regs.

Petitioners contend that, in 1986, they owned 70 vending machines out of the total of 490 and that they prorated all corporate operating expenses between the vending machines alleged to be theirs and the total. However, petitioners presented no evidence demonstrating the proration or allocation between the vending machines claimed by petitioners and the corporate vending machines.

It should also be noted that PWIC, PWMC, and C.B. Crest, in addition to commercial water purification, leased systems for home use. Petitioners conceded on brief that they failed to

identify and prorate those expenses of home use water purification systems. They explained that the home use aspect was "overlooked" in their Federal income tax returns because it was no more than 2 percent of the total revenue.

Because petitioners have not been able to substantiate the amounts of expenses or establish their ownership and operation of the approximately 70 vending machines, we hold that they are not entitled to deduct the claimed expenses.

C. <u>Petitioners' Obligation To Report Gross Income From the Vending Machines</u>

Petitioners contend, in the alternative, if they are not entitled to deduct vending machine depreciation and deductions claimed on their Schedules C for 1986 and 1989, then they incorrectly reported the gross receipts from those same vending machines. Petitioners reported gross receipts from the vending machines of $163,001 and $72,817 on their 1986 and 1989 Schedules C, respectively. Respondent contends that petitioners constructively received income from their corporations.

The notice of deficiency makes no determination concerning the income or its source reported on petitioners' Schedules C. Respondent's determination regarding the Schedules C simply involved the disallowance of the claimed deductions. For purposes of trial and briefing, respondent argues that petitioners did not establish their entitlement to the depreciation or other deductions in connection with the vending

machines, in part, because they did not own or show their ownership of the machines.

Respondent proposed several arguments in response to petitioners' argument that they are not required to report the income if we find, as we did, that they did not own the vending machines. Respondent argued that payments made to third parties on behalf of a corporation's sole shareholder are income to the shareholder. That argument is inapposite with respect to the amounts petitioners reported on their 1986 and 1989 returns as income from the vending machines that they believed they owned. In another part of this opinion we address the question of whether payments made to or on behalf of petitioners are income to them and should have been reported by them.

Respondent also argued that petitioners constructively received the income from the vending machines and income from the sale of the Crestwood property. As to the constructive receipt, respondent does not contend that petitioners specifically received the $163,001 or $72,817 amounts from the corporations or that those amounts are constructive dividends. Although the record reflects that petitioners are required to report certain income they received as compensation or because the corporation(s) paid petitioners' obligations, that matter is also addressed in another portion of this opinion. Attribution of the amounts reported as vending machine receipts to the amounts

specifically received by petitioners or paid on their behalf would result in duplication of the items.

Respondent also argued that a series of bookkeeping entries on October 31, 1989, constituted a set-aside of income, which support respondent's argument that petitioners should have reported the $163,001 and $72,817 amounts of income for 1986 and 1989, respectively. The bookkeeping entries involved the $150,316 reduction to an account entitled "Loans Payable-S. Bowden" and a equal increase to an account "Salaries-Supervision". Respondent contends that the $150,316 could have constituted a constructive receipt of funds. From the record, the nature of these bookkeeping entries is not apparent, and it is not evident that petitioners had an unrestricted right to withdraw money or that it was available to be withdrawn.

Finally, respondent apparently argues that petitioners built a large and luxurious house and that the two tax returns under consideration do not support their ability to build such a house. We cannot agree with respondent's conclusion without further evidence and analysis. In particular, respondent has not performed a reconstruction of petitioners' income for the 1986 or the 1989 tax year in order to provide a starting point from which a comparison of income and/or worth could be made.

Accordingly, we hold that petitioners were not required to report the income from the vending machines on their 1986 and

1989 Schedules C, based on our findings and holdings that petitioners did not own certain of the vending machines and that they were not entitled to depreciation and other deductions.

D.   Transfer of Crestwood Property to Prudential Bancorp

On September 15, 1989, petitioners transferred the Crestwood property to Prudential Bancorp.  In exchange, petitioners were released from their obligations to Southern Pacific and NBSC, the debt owed Hollis Bowden, and the $1.4 million loan obligation to Concordia Bank.  In addition, all debt giving rise to mechanic's liens on the property was satisfied.  The obligations to Southern Pacific and NBSC were in connection with petitioners' corporations' debts and petitioners' personal guaranties. Prudential Bancorp, after obtaining the Crestwood property from petitioners, sold it to unrelated third parties for $2,525,000, its fair market value.

Petitioners reported, on their 1989 income tax return, that the sale price of the Crestwood property was $1,786,000, with a cost basis of $1,872,776.[17]  It appears that petitioners derived the "sale price" from their computation or estimate of the amount of debt canceled by means of the settlement.  Petitioners therefore reported a loss of $86,776 on their 1989 tax return. On brief, petitioners contend that the sale price should be

---

[17] On brief, petitioners erroneously state a "total cost of $1,786,000" and "a sales price * * * of $1,872,776".

derived from the total of all claims paid by Prudential Bancorp in the settlement agreement, rather than the ultimate sale price to third parties.[18]

Generally, a transfer of property by a debtor to a creditor in satisfaction, in whole or in part, of an indebtedness constitutes a "sale or exchange" under section 1001, and the excess of the fair market value over the basis of the property applied against the indebtedness constitutes taxable gain.  Gehl v. Commissioner, 102 T.C. 784, 786 (1994), affd. without published opinion 50 F.3d 12 (8th Cir. 1995); Allan v. Commissioner, 86 T.C. 655, 659-660 (1986), affd. 856 F.2d 1169, 1172 (8th Cir. 1988); Freeland v. Commissioner, 74 T.C. 970 (1980).  The sale price represents the fair market value of the property at the time of sale.  Sec. 1.1001-1(a), Income Tax Regs.

Petitioners, on brief, argue that they understated the cost basis reported on their return because they calculated the Concordia Bank loan as $1 million instead of $1,400,000.  Petitioners contend that the addition of the omitted amount brings the cost basis to $2,186,000.  Petitioners also contend

_____

[18] It is not likely that the total of all debts settled with Prudential Bancorp approximated $1.8 million.  That is so because the minimum amount of debt on the Crestwood property, as contended by respondent, is $1.75 million.  In addition to the debt outstanding on the Crestwood property, petitioners settled their obligations relating to the corporate debt.  It is likely that the total or overall amount of debt settled exceeded the eventual sale price of the Crestwood property, or $2,525,000.

that the sale price was properly $2,272,776. Based on these amended figures, petitioners argue they would be entitled to claim a loss.[19]

Respondent contends that petitioners should recognize gain from the transfer of the Crestwood property computed as the difference between the fair market value of the Crestwood property and petitioners' cost basis. Specifically, respondent contends that the deemed gain is $750,000, which is the difference between $2,525,000, the fair market value of the property (the gross sale proceeds of the property received by Prudential Bancorp) and petitioners' basis in the property. Respondent determined petitioners' basis in the Crestwood property to be $1,775,000, comprising two amounts--$375,000 and $1.4 million. These amounts represent the loan from Concordia Bank, the proceeds of which were used by petitioners to construct a residence on the property, and the cost of the land.

Based on the documentary evidence and petitioners's testimony, it is apparent that petitioners' basis in the Crestwood property exceeded the outstanding balance of the mortgage and the cost of the land. The additional amount is attributable to the outstanding mechanic's liens. In these circumstances, petitioners' testimony, along with other related

---

[19] Assuming petitioners' amended figures to be correct, the transaction would have resulted in a gain of $86,776. See sec. 1.1001-2(a), Income Tax Regs.

evidence, reflects that their basis in the property would have originally been more than $1.75 million. Therefore, we hold that petitioners' basis, as determined by respondent, was understated. Accordingly, we hold that petitioners' basis in the Crestwood property was $2 million. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). Accordingly, petitioners must recognize $525,000 of gain on the transfer of the property to Prudential Bancorp.

E. Unreported Income

1. Salaries

Petitioners have stipulated that they failed to report salaries and self-employment income in varying amounts for 1986 and 1989. Those amounts will be considered in the Rule 155 computation.

Petitioners reported $42,000 of income subject to Social Security on Schedule SE of their 1986 Federal income tax return. Respondent contends that Mrs. Bowden omitted $18,000 in compensation from PWIC in the 8-month period ending December 31, 1986. Petitioners contend that the $18,000 was, in fact, included in the $42,000 already reported on the aforementioned Schedule SE. From the record in this case, we have no reason to doubt petitioners' testimony that the $18,000 amount was already included in the total of $42,000 that respondent determined should be reported. Accordingly, the $18,000 is deemed to be part of the $42,000 already reported by petitioners.

2. Reimbursements and Other Items

During 1986, Mrs. Bowden received $21,626.59 from PWIC and AVC for auto expenses, entertainment, consulting, and other unidentified items. Also, in the same year, petitioners' corporations paid $14,138.48 on behalf of Mrs. Bowden to a travel agency, Crocker National Bank, Pentech Financial Services, and the San Bernardino County tax assessor. Petitioners' corporations also made payments on loans still outstanding to both the Bank of Whittier and NBSC, respectively. In 1986, petitioners' corporations paid $10,762.21 for Mr. Bowden's life insurance and credit card charges. In the same year, Mr. Bowden received $399.56 from PWIC as reimbursement of entertainment expenses.

In 1989, Mrs. Bowden received $16,942.89 from C.B. Crest for postage expenses, rental income, and other unidentified items. Petitioners' corporations paid on behalf of Mrs. Bowden a debt owed to Newport Vending in the amount of $44,250. Payments were also made to the Bank of Whittier and NBSC on the loans still outstanding. In 1989, petitioners' corporations paid on behalf of Mr. Bowden $8,407.42 for his credit card charges.

Generally, taxpayers are required to maintain adequate and complete records to substantiate their expenses. Sec. 6001; Meneguzzo v. Commissioner, 43 T.C. 824 (1965). Also, it is well settled that if a taxpayer's obligation is paid by a third party,

the effect is the same as if the third party had paid the taxpayer who in turn paid his creditor. Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929). Moreover, transactions between closely held corporations and their shareholders warrant close scrutiny. Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).

In this instance, all of these aforementioned items were charged as corporate expenses. Petitioners did not report them on their income tax returns. They contend that these items were not items of income but were reimbursements for their payments of corporate expenses.

Petitioners have submitted incomplete corporate records for the taxable years in question. The checks submitted as evidence merely represent payment by the corporations to petitioners. Also, petitioners did not offer as exhibits any substantiation of the expenses allegedly incurred on behalf of the corporations. For example, Mr. Bowden did not proffer any of his credit card bills that were paid by the corporations which would have provided an opportunity to scrutinize the basis for the payments. Paula Constr. Co. v. Commissioner, supra. Some of the disputed items were facially questionable. For example, PWIC paid $700

for Mrs. Bowden's travel to Japan where she had relatives and allegedly explored business opportunities.  We do not accept petitioners' uncorroborated testimony on these items.

We also find it telling that petitioners were able to submit complete corporate records for certain time periods but that records were incomplete for other time periods.  Even factoring in a loss of records due to the Crestwood property floods, there remain unexplained inconsistencies concerning the corporate records.  For example, petitioners did not present a coherent explanation why particular corporate records were located at the Crestwood property and not at other business locations.  Also, petitioners were able to submit to respondent the complete general ledgers for PWIC's 1986 calendar year.  We do not understand why these particular ledgers were unaffected by the Crestwood property floods while PWIC's records for 1989 are incomplete.

Also, petitioners do not address the fact that C.B. Crest's records do not include the months of September, November, and December 1989 as well as the complete month of August 1989.  Petitioners cannot attribute the absence of these records to the December 1987 and June 1988 Crestwood property floods.

Accordingly, we sustain respondent's determination that petitioners are liable for tax on the expenditures paid by the corporations.  Petitioners have failed to show that these

expenditures represent reimbursement of corporate business expenses.

F.   Self-Employment Tax

Section 1401 imposes a tax on the "self-employment income" of every individual.  "[S]elf-employment income" is defined generally in section 1402(b) as the "net earnings from self-employment derived by an individual * * * during any taxable year".  Section 1402(a) defines the term "net earnings from self-employment" as the "gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business".  Section 1.1402(a)-2(b), Income Tax Regs., provides that "The trade or business must be carried on by the individual, either personally or through agents or employees."

Petitioners reported $42,000 of income subject to Social Security on Schedule SE of their 1986 Federal income tax return. Moreover, petitioners have stipulated that $51,679.84 was received by Mrs. Bowden from C.B. Crest during the 7-month period ending July 31, 1989.  In the same time period, petitioners have also stipulated that Mr. Bowden received $17,479.84 in salary. Also, between January 1 and May 31, 1989, PWIC paid Mrs. Bowden $4,100 in salary.

Other than the $42,000, petitioners did not report those amounts as income on their 1989 Federal income tax return or show that the amounts constituted salary as opposed to self-employment income. Accordingly, we find that petitioners are liable for self-employment tax on those amounts for the taxable year 1989.

G. Underpayment Due to Negligence

Respondent determined an addition to tax due to negligence under section 6653(a)(1)(A) and (B) for petitioners' 1986 taxable year. Respondent also determined an accuracy-related penalty due to negligence under section 6662(a) for petitioners' 1989 taxable year. The penalty under section 6662(a) for negligence is decided under a standard similar to that of the addition to tax for negligence under section 6653(a)(1).

For the 1986 taxable year, section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment of the tax required to be shown on a taxpayer's return if any part of that underpayment is due to negligence or disregard of rules or regulations. Section 6653(a)(1)(B) also provides for an addition to tax of 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment which is attributable to negligence or intentional disregard of rules and regulations. Section 6653(a)(3) defines the term "negligence" to include any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code. This section also

defines the term "disregard" to include any careless, reckless, or intentional disregard. See Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Section 6662(a) and (b)(1) provides that if any portion of an underpayment of tax is attributable to negligence or disregard of rules or regulations, then there shall be added to the tax an amount equal to 20 percent of the amount of the underpayment which is so attributable. The term "negligence" includes any failure to make a reasonable attempt to comply with the statute, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Petitioners have the burden of proving that respondent's determination is in error. Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

Petitioners failed to report various items of income for the 1989 taxable year. Petitioners also failed to provide respondent with complete information concerning their corporations' operations and expenses for the entire 1986 and 1989 calendar years. We have previously held, even factoring into account any missing records caused by the Crestwood property floods, that petitioners did not maintain adequate records. For example, the Crestwood property flood is not an excuse that can be used by petitioners for the 1989 records of PWIC and C.B. Crest because the floods occurred in December 1987 and June 1988.

In addition, petitioners did not present a coherent explanation of why certain corporate records were apparently stored in the Crestwood property and other records stored elsewhere for business purposes, or why only one corporation leased part of the Crestwood residence, but several corporations' records were allegedly lost due to floods at the residence. Further, petitioners did not adequately explain why C.B. Crest's records do not include the months of September, November, and December 1989 as well as the complete month of August 1989.[20]

Finally, petitioners did not demonstrate any apportionment between the expenses associated with the operating of the vending machines and other water purification systems. Petitioners concede that they "overlooked" the other business of home water purification units because it was "an exceedingly small amount of revenue".

Mr. Bowden has an accounting background. He knew or should have known that he was required to maintain adequate books and records to support the claimed deductions. See sec. 1.6011-1(a), Income Tax Regs. As noted, petitioners have failed to show that they maintained adequate books and records to support their claimed Schedule C deductions.

---

[20] Petitioners testified that "activities in C.B. Crest were limited", and thus, activities for August and September 1989 were recorded in October of that year, and activities for November and December 1989 were recorded in January 1990.

Accordingly, we hold, to the extent that underpayments exist, petitioners are liable for the additions to tax under section 6653(a)(1)(A) and (B) for the 1986 taxable year and the accuracy-related penalty under section 6662(a) for the 1989 taxable year.

H.   Substantial Understatement

For 1986, section 6661 provides that if there is an understatement of income tax for any tax year which exceeds the greater of 10 percent of the tax required to be shown on the return for the tax year or $5,000, an addition to tax shall be imposed.  The understatement is reduced by section 6661(b)(2)(B) by that portion for which there is "substantial authority" or that has been "adequately disclosed".

For 1989, section 6662(a) and (b)(2) provides that if any portion of an underpayment is attributable to a substantial understatement of income tax, then there shall be added to the tax an amount equal to 20 percent of the amount of the underpayment.

Petitioners have not offered any probative evidence to support their claimed Schedule C deductions or to show why they failed to include income and/or disclose liability for all self-employment tax in 1989.  Therefore, petitioners did not adequately disclose their earned compensation, and no substantial

authority has been shown to support petitioners' deductions and failure to report income from various sources.

We hold, to the extent that an understatement exists, petitioners are liable for the addition to tax under section 6661(a) for 1986 and the accuracy-related penalty pursuant to section 6662(a) and (b)(2) for 1989. For 1989, a single penalty of 20 percent is imposed under section 6662 though the underpayment for that year is attributable to both negligence and substantial understatement.

I. Failure To Timely File Their Return

Respondent determined that petitioners are liable for an addition to tax for the failure to timely file a return. Section 6651(a)(1) imposes an addition to tax for failure to file a timely income tax return. Petitioners bear the burden of showing respondent's determination to be in error and that there was reasonable cause for their failure to timely file. Rule 142(a).

Petitioners' 1986 and 1989 Federal income tax returns were filed during July 1988 and October 1990, respectively. Petitioners contend that they did not file because they were unable to pay the income tax due in both taxable years due to "insufficient funds". Petitioners have not demonstrated that their lack of funds was a reasonable cause for their failure to timely file. Therefore, to the extent of any tax required to be shown, which was not shown, petitioners are liable for the

addition to tax under section 6651(a)(1) for their 1986 and 1989 taxable years.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.